J. D. MARTIN v. BRAID ELECTRIC COMPANY et al.

Middle Section.    February 8, 1929.

Petition for Certiorari denied by Supreme Court, June 15, 1929.

Seth M. Walker, Jno. J. Hooker and J. B. Daniel, all of Nashville, for plaintiff in error.

R. A. Goodman and S. L. Lowenstein, Jr., of Nashville, for defendants in error.

FAW, P. J. The plaintiff in error J. D. Martin (hereinafter called plaintiff) has brought this case up by an appeal in the nature of a writ of error from a judgment of the third circuit court of Davidson county dismissing his suit and taxing him with the costs.

Plaintiff was severely and painfully burned, particularly about his face, head, neck and hands, in a fire which practically destroyed the interior of the Studio of the Radio Broadcasting Station at Nashville known as WBAW, in the evening of December 26, 1926, and on April 23, 1927, plaintiff began this action against the defendants in error Braid Electric Company and J. Y. Waldrum (hereinafter called defendants) to recover of them the damages occasioned by the injuries thus suffered by him.

The case was tried to a jury in the circuit court on the issues made by the defendants' pleas of not guilty to plaintiff's declaration, and at the close of all the evidence the defendants moved the court for peremptory instructions in their favor, but this motion was at that time overruled and the case was submitted to the jury.

The jury returned a verdict finding the issues in favor of the plaintiff and assessing his damages at $15,000, whereupon judgment was entered in favor of the plaintiff and against the defendants for $15 000 and all the costs of the cause.

In due season, the defendants moved for a new trial on numerous grounds stated in their motion, one of which was that the court erred in overruling the motion of defendants, made at the conclusion of all the proof in the cause, that the court instruct the jury peremptorily to return a verdict for the defendants, which ground of the motion was sustained, and plaintiff's suit was dismissed, at plaintiff's cost, as before stated; whereupon plaintiff moved for a new trial, but his motion for a new trial was overruled, and he thereupon prayed, obtained and perfected an appeal in the nature of a writ of error to this court and is here insisting, through assignments of error, brief and argument of counsel, that the trial court erred in sustaining the motion of defendants for a directed verdict.

The declaration, as originally filed, contained one count only, but subsequently a second count was, by leave of the court, filed as an amendment to the declaration, and, at the trial, the plaintiff abandoned the first count and relied upon the second count, alone, which second count is in words and figures as follows:

"Plaintiff, J. D. Martin, sues the defendants Braid Electric Company, a corporation, and J. Y. Waldrum for fifteen thou-

sand dollars damages and for cause of action avers, that:

"The defendant Braid Electric Company, is a Tennessee corporation engaged in business in Nashville, Davidson county, Tennessee and said corporation and its co-defendant, J. Y. Waldrum, during and prior to December 1926, owned, maintained and operated a Radio Broadcasting Station in a building on south east corner of Church street and Sixth avenue in the City of Nashville, Davidson county, Tennessee.

"Plaintiff avers that the defendants fitted up a Radio Broadcasting Station in a room in said building on the second floor, lining it with inflammable cotton, and installed therein an electric fan; the purpose of the cotton was to deaden or soften the sound, while the electric fan was for the comfort of the musicians when the weather was warm or when the room was for any reason stuffy and on that account unhealthy and uncomfortable unless a fan was used. This fan was operated by electricity furnished by the Nashville Railway and Light Company, and the current was turned on or off by means of a button or switch as desired by the musicians occupying the room and rendering the music to be broadcasted by means of the Radio by said defendants from said Broadcasting Station.

"In view of the very highly inflammable character of cotton covering said room, the defendants were charged with a very high degree of care and caution in the selection, installation and maintenance of said fan and all its constituent parts and connections, so that when the electricity was on there would be no spark, flame or blaze that might ignite said cotton and cause a conflagration in the room. This duty also involved the necessity of inspection, supervision and oversight. It was defendants' duty to maintain said fan in a reasonably safe condition so that the place of work would be reasonably safe.

"And plaintiff avers that said fan together with all its parts was under the exclusive control and management of the two defendants by whom and in the interest of whose business it was used.

"Plaintiff avers that the defendants negligently omitted and failed to perform their duty in these respects, and that on the night of December 26. 1926, as the direct and proximate result of such negligenc, a flash of fire. flame and blaze flew out from said fan into the room lined with cotton as aforesaid, and caught the cotton on fire and caused a great conflagration in said room and the adjoining hall and seriously and permanently burned and injured plaintiff in his face, head, neck, ears, eyes, hands and arms.

"These injuries thus so wrongfully and negligently inflicted upon the plaintiff caused him to suffer great pain in body and mind, and he still suffers and will continue to suffer. The injuries and shock incident thereto, seriously and permanently impaired his nervous system. Plaintiff was confined to his bed for many weeks, lost much valuable time and his earning capacity has been permanently materially diminished. And in addition his face. neck and ears are horribly and permanently scarred and disfigured.

"Plaintiff incurred much expense by way of doctors bills and for medicines. etc., in an effort to get relief from said injuries and suffering, and in which efforts he has only been partially successful. He will have to incur other expenses in the future for treatment.

"All of which occurred without fault on the part of plaintiff, but resulted directly and proximately from the wrongs and negligence of the defendants as aforesaid.

"To his damages in the sum of fifteen thousand dollars: Wherefore he sues and calls for a jury to try the issue."

Pending the trial, plaintiff was permitted to amend the summons and declaration so as to sue for $25 000 instead of $15,000.

It is seen that plaintiff avers in his declaration that defendants were guilty of negligence in the following respects: (1) In negligently omitting and failing to perform their duty "in the selection. installation and maintenance of said fan and all its constituent parts and connections. so that when the electricity was on there would be no spark, flame or blaze that might ignite said cotton and cause a conflagration in the room." (2) In negligently omitting and failing to perform the duty of "inspection, supervision and oversight" of said fan. (3) In negligently omitting and failing to "maintain said fan in a reasonably safe condition so that the (plaintiff's) place of work would be reasonably safe."

The basis of defendants' motion for peremptory instructions, as stated therein, was. in substance, that there is no evidence showing or tending to show that the defendants. .or either of them, or their agents. servants or employees, were guilty of any act of negligence or breach of duty or other wrongful act or omission which in anywise caused or contributed to the injuries alleged to have been sustained by the plaintiff.

It appears, without dispute. that. in June. 1926. defendants furnished and equipped a room on the second floor of a building known as the Capitol Theater Building. at the southeast corner of Church street and Sixth avenue in the City of Nashville, as a Studio. or broadcasting room, and operated same thereafter, with

daily programs, until and including the evening of December 26, 1926, when the furnishings and equipment of the Studio were destroyed by fire as before stated.

While programs were being broadcasted, the Studio was in charge of an announcer, Harry Stone, employed by defendants. Arthur Henkel was employed by defendants as musical director, and Mr. Henkel selected and employed musicians as occasion demanded for the musical programs, acting in this matter according to his own judgment and discretion, except that the rate of compensation to be paid the musicians thus employed by Mr. Henkel was agreed upon in advance between Mr. Henkel and the defendants, and the defendants would give Mr. Henkel a check to cover this amount and Mr. Henkel would pay the musicians.

Plaintiff had not been regularly employed as a musician or otherwise at defendant's Studio prior to the fire, but had played there on two previous occasions. On the occasion in question he was employed as a substitute for W. R. Leath, a cornetist, who was sick.

When the room in question was prepared and equipped by defendants for a Studio the openings were all closed and covered, except one window in the west end of the room opening on Sixth avenue, and one door, over which there was a transom, in the east end of the room opening into a hall which led to a passenger elevator used by persons going to and from the Studio. The ceiling was plastered, and cotton batting about an inch or an inch and a half thick was glued to the walls and ceiling. Gauze, or cheese cloth, was tacked on the cotton batting and thin silk, known as ABC silk, in folds drawn tight from top to bottom, was tacked over the gauze on the walls, and likewise ABC silk drawn in folds radiating from the center, was tacked on the ceiling. A piano, microphone, telephone and several chairs were in the room, and, at the time of the fire, there was a Christmas tree in a corner at the west end of the room.

The lower sash of the aforementioned window was fastened so that it could not be raised, and the glass had been removed from the upper sash and a wooden sash or frame substituted, and a ventilating fan, or "blower fan," was placed in the center of this upper sash, seven feet above the floor. The outer edge of the fan on either side was fourteen inches from the window frame.

There were two heavy curtains, or "draperies," over the window, which were suspended from a rod above and so arranged that they could be drawn back—one to each side of the window—when it was desired to operate the fan. The curtains were drawn back and the window and fan exposed to view when the fire in question occurred. The wall coverings and curtains in the Studio were "highly in-

flammable." The witnesses so state, and this is obvious, as a matter of common knowledge, from the nature of the materials of which they were made.

The fan in question was reversible, in that, it could be used, at will, either to draw air into the room from the outside or to expel air from the room. Two switch cords were suspended from the switch attached to the fan, and the direction of the air current created by the fan depended upon which of these cords was pulled by the operator.

A musical program occupying one hour—from six o'clock to seven o'clock—was rendered by an orchestra in the Studio of WBAW in the evening of December 26, 1926, in which plaintiff participated as a cornetist as before stated. Plaintiff says that the fan was "turned on" for about five minutes immediately before the "concert" begun. There is no suggestion that there was anything wrong with the manner in which the fan operated at that time.

Plaintiff Martin testified on the trial that after the "program" was over and the musicians, including himself, were "packing up" to leave. Mr. Stone, the announcer, "connected up the fan and kept it on a few minutes;" that after he (plaintiff) had put his cornet in its case and was ready to get his overcoat (it was near the window), there was "a flash, a flame started, then everybody got excited."

We quote some excerpts from plaintiff's testimony as follows:

"Q. Mr. Martin, was this fan, after it was turned on, was it revolving? A. Yes, sir.

"Q. I will ask you whether or not, that fan, when it was turned on, if those spokes in it went around fast or slow? A. I just know the fan started, that is all, I didn't look at it until those sparks attracted my attention, and I looked up.

"Q. When you looked up, what did you see, if anything, in the way of fire? A. The fire got to a space from twelve to eighteen inches in diameter, and was going very fast.

"Q. Did you see any flame shoot out from this fan? A. I saw a spark, I wouldn't say it was a flame or not, it was a flash, and the flames immediately followed.

"Q. How close were these curtains and this silk drapery to this fan? A. As near as I can recollect, it came right down to the window sill.

"Q. How many inches would that be from the fan? A. Probably three or four.

"Q. Three or four inches from the fan, that is, the curtains were? A. Yes, sir.

"Q. What kind of drapery and curtains were located in this place, as to whether it was heavy material, or whether thin and inflammable stuff? A. Well, I couldn't say, it was just regular drapery. If I had had my hands on it and felt it, I could have told whether it was light or heavy.

"Q. How long was it from the time the flash went out from this fan, until that whole room was on fire? A. I think it was less than a minute from the time this whole thing happened, within less than a minute, I could safely say.

"Q. Just spread everywhere? A. Yes, sir.

"Q. Where were you when the fire first hit your body, or any part of it? A. I was about twenty feet, probably, from the Studio, in the hall.

"Q. How did the flames get out in the hall there, Mr. Martin, with that door shut? A. The transom was open.

"Q. There was a transom as shown in this picture, to that door, one at the top of the door, is that right? A. Yes, sir.

"Q. Now was that the only place that the fire got from the room into the hall? A. Yes, sir.

"Q. What size blaze was it that shot out through there? A. I didn't see, my back was turned, and I just felt it.

"Q. What did you do in an effort to avoid injury and escape from that fire? A. Well, I didn't get excited, I had presence of mind enough to close the door when I came out, and had the transom been closed, I don't think a one of us would have gotten scorched.

"Q. Of course, that would have shut the flame off? A. Yes, sir.

"Q. Now, you were out in the hall then when the first flames struck you, so to speak? A. Yes, sir.

"Q. Whereabouts did it strike you out there? A. Well, about the base of my head to my feet, it burned my clothes practically off of me, but it did not burn me below my collar bone, it just burned my arm here and head.

"Q. Do you remember how many people there were in the room, or approximately how many there were, when this fire started? A. Well, I believe we had nine men, or eight pieces in the orchestra, seven or eight, and the announcer.

"Q. Do you recall whether you had your hat on or off? A. My hat was in my hand.

"Q. You didn't have on your overcoat, you didn't have time to put that on? A. No, sir. . . .

"Q. Was there anybody smoking any cigarettes, or anything like that up there, or anybody lighting any matches up

there that you saw? A. I saw no one doing it. In broadcasting you go right ahead, from one tune to another, as fast as you can play, and the announcer announces it, and you go right on, they don't have time to smoke, if they allowed it.

"Q. I will ask you if they allowed anybody to smoke in there? A. I don't know.

"Q. Did you see any smoking by anybody there? A. No, sir.

"Q. You have played in other Radio Studios, have you not? A. Yes, sir, I have played, I will say, at least once in every one in Nashville at some time.

"Q. Was there anything about the arrangement of this Studio that you were burned in, that was different, especially so far as safety was concerned, from the others you played in? A. The only difference I would notice would be the entrance.

"Q. I am speaking of the equipment of the Studio itself, not the building. A. At a rough estimation, I should say they were about the same. . . .

"Q. Mr. Martin, are you sure this flame you speak of came from the fan? A. It came from the edge of the fan there— Do you know where else it could come from?

"Q. I am asking you—Are you certain it came from the fan? A. Practically so, I could not say absolutely.

"Q. You saw it? Yes, I saw it come from the fan.

"Q. Did you see it at the moment of its coming from the fan? A. I just saw the flash. I was in this direction, and caught it, and looked around and the fire started.

"Q. It attracted your attention? A. Yes, sir.

"Q. You had finished playing, and your mind, of course, was not on music at that time, and you were fixing to go home? A. Yes, sir.

"Q. How far do you say the edges of these hangings were from the fan? A. I should judge about three to four inches, just the space that come down along side of the window is all, we could see the window and the fan.

"Q. These hangings, as I understand it, the edge of it came up to the edge of the window casing, is that right? A. To my best recollection.

"Q. They certainly didn't extend over in front of the fan? A. No, sir.

"Q. Do you know how wide those window sashes were, that window casing, about the width of one of these? A. No, sir,

it is not quite that wide, I would judge five or six inches narrower than what that is.

"Q. Do you know what the diameter of the fan was? A. No, sir.

"Q. Did it fill up completely the window sash? A. It filled up the cover that it was in.

"Q. Did the cover it was in fill up the complete width of the sash? A. I couldn't say positive, I didn't pay that much attention to it.

"Q. And you don't know what the diameter of the fan was, I believe you say? A. No, sir.

"Q. Was the fan sitting in the middle of the window proper? A. To the best of my knowledge it was.

"Q. And it was then engaged in withdrawing the foul air from the room? A. I don't know whether it was withdrawing foul air from the room, or bringing the air from the outside, but I was told later that the fan worked both ways.

"Q. You don't know what it was doing at that time? A. I know it was running.

"Q. Do you know what the occasion was to turn on the fan after you quit your concert? A. No, sir, I do not, only to get some air in the room, it was very stuffy."

Mrs. A. L. Erwin was a member of the orchestra in the Studio at the time of the fire and testified on the trial as a witness for plaintiff. We quote from Mrs. Erwin's testimony as follows:

"Q. Mrs. Erwin, when was it you first noticed anything out of the ordinary, that happened there that night? A. After we had finished, as I was buttoning up my case to my violin, I looked up and saw a flash.

"Q. You mean, you were putting your violin in the case? A. My violin was in the case, and I was buttoning the case together.

"Q. And you saw what? A. A flash of fire that shot out from the fan, up on the wall, it shot out like a little streak of blue fire to the curtain drapery.

"Q. Is that the electric fan on the wall in the room in which the Station is located? A. It is not like one of those on the wall, I suppose it is a ventilating fan.

"Q. How is the fan made, whether or not it is enclosed by a case of metal, or how is that? A. It looks like a little piece of metal and then the blades of the fan are inside of that.

"Q. Where did the flame come from, those blades? A. It shot out from under the blades of the fan.

"Q. From under the blades of the fan? A. From the edge of the blades.

"Q. Where did the flame go to, after it got out from the edge of the fan like that? A. Right into the drapery on the wall, thin silk drapery. . . .

"Q. What happened about that fire, did it stop burning then, did it burn slowly, or how did it do? A. Just a flash, and the whole top of it looked like it was on fire.

"Q. Practically immediately, you mean, the top of the room became on fire? . . .

"Q. Where was the blaze communicated to after it left the corner of the window? A. I don't remember those curtains, but the fire shot out into this drapery in the corner.

"Q. Into this ABC silk cloth in the corner. A. Yes, sir.

• • • • •

"Q. Mrs. Erwin, I believe you stated this blaze shot out, from the end of the blades of the fan, apparently to the drapery, or coverings fixed there—How long was that blaze, and what size blaze was it, or flame? A. It was just a little flash, just shot out into that drapery. That may not be technical, but that is the way it looked.

"Q. That is the way it happened? A. Yes, sir.

"Q. You saw it there right at that time, and was looking right at it? A. Yes, sir.

"Q. What color was it? A. Just fire.

"Q. Ordinary blue or white or red, or how? A. It looked like the color of fire.

"Q. It looked like the color of hot fire, and you have your hands like that? (Indicating). ' A. It was not that long.

"Q. How long was it? A. About four inches.

"Q. You say that is about how long the flame appeared to you, when it jumped from the end of the fan to this drapery or covering there? A. Yes, sir.

"Q. Was or not the drapery, where the flame went into it, in folds like it was on the rest of the walls? A. Yes, sir, as well as I remember. . . .

"Q. Now, you say the flame came from the fan? A. Yes, sir.

"Q. And you saw the flame jump about four inches? A. It just looked like a little flash of fire about four inches long.

"Q. I believe you estimated it at four inches? A. Yes, sir.

"Q. Now the curtains on that wall, on that side, were not over the fan, were they? A. No, sir.

"Q. They were drawn aside to permit the fan to suck the air out of the room? A. Yes, sir.

"Q. That is what the fan was doing, it was ventilating the room by drawing out the super-heated air out of the room at that time, that is what it was doing, wasn't it? A. Yes, sir.

"Q. Did you see anybody smoking there, that night? A. No, sir, they don't smoke in broadcasting stations.

"Q. You mean by that, they are not supposed to smoke? A. I never saw anyone smoking.

"Q. Did you ever see anyone smoking in any of these Studios? A. No, sir.

"Q. Never did? A. No, I never saw anyone smoke in a broadcasting station. . . .

"Q. Was the fan operating, when the concert started? A. I can't say, I don't know.

"Q. You don't know how it was turned on, or who turned it on, or why? A. I don't know."

We also quote from the testimony of Professor Arthur Henkel, who testified as a witness for plaintiff, as follows:

"Q. Who controlled that fan, who turned it on and turned it off, and controlled the fan, and the whole apparatus, connected with the station there? A. I suppose Mr. Stone.

"Q. Did Mr. Martin have anything to do with it, or did you have anything to do with it? A. No, we never touched it.

"Q. Did you have anything to do with raising the curtains and fixing the curtains, or turning on the fan, or anything like that? A. No.

"Q. Where were you standing, when you first noticed anything had happened this night, out of the ordinary? A. I was at the piano just gathering up the music.

"Q. You were playing the piano, I believe, as part of the orchestra? A. Yes, sir, I was pianist.

"Q. Where was that piano sitting in the room, with reference to the window where this fan was located? A. How?

"Q. How was the piano located with reference to the window in which the fan was located?

"By the Court: I don't see how that is material.

"By Mr. Hooker: Q. Were you facing the piano or the other way? A. No, say the piano was there. I was standing there, gathering up the music, and the window was over there (indicating).

"Q. What was the first thing you saw? A. I just saw a flame up at the window.

"Q. Where did you see that flame with reference to the fan, how far away from the fan? A. I suppose five or six inches to the right, up in the corner beyond the window. . . .

"Q. When you first looked around there, or when you first saw this flame, out of the corner of your eye, or however it was you did see it, where was it burning, with reference to this curtain, was the curtain burning or not? A. I think the curtain was burning.

"Q. That is your best recollection about it? A. That is my best recollection. . . .

"Q. To refresh your recollection, wasn't it the eighteenth concert, you all had given up there? A. Yes, sir, since you mentioned it, I think we agreed to give twenty concerts, that was the agreement to begin with, and I think we had given eighteen concerts, or sixteen.

"Q. Were you or not giving them once a week, or more than that? A. Once a week.

"Q. When you were going up there this other seventeen or eighteen times, did you see this fan up there in operation? A. Yes, I suppose so.

"Q. At any time when you went up there, and saw the fan, did you ever see anybody inspect it, or do anything, to see whether it was in good running order, or not? A. No, sir, I never did.

"Q. Did you ever see any evidence up there, where any electrician or anybody else had been up there and inspected this fan, or looked to see whether it was in good running order or not, or whether it would explode? A. No, I did not.

"Q. Who turned the fan on that night? A. I think Mr. Stone.

"Q. Is he or not the announcer for that station? A. He was the announcer.

"Q. Was he there on all the other occasions, and did he or not have full and complete charge of the station, and was running it and controlling everything about it? A. Yes, sir."

In putting on his proof in chief, plaintiff also introduced as witnesses Dr. A. L. Erwin, William S. Blanton and Mrs. J. D. Martin, plaintiff's wife, but neither of these last named three witnesses were present at the fire. The testimony of Dr. Erwin and Mrs. Martin related to the nature and extent of plaintiff's injuries, and Blanton, who had assisted in the work of preparing the walls of the Studio, testified mainly with respect to the manner in which this work was done, and he stated that he visited the Studio frequently —almost every day—until the fire occurred, and he testified to certain conditions to which we will have occasion to refer later in this opinion.

Plaintiff offered no evidence of the origin of the fire beyond the testimony of the witnesses from whom we have quoted to the effect

that they saw a flame shoot out from the fan. When we speak, in this opinion, of the origin of the fire, we are using the word origin as meaning "that from which anything primarily proceeds; the fountain; spring; cause; occasion." (See Webster's New International Dictionary). This is the sense in which the word is used in Memphis Street Railway Co. v. Cavell, 135 Tenn., 462, 467 (187 S. W., 179), where the phrases "origin of the injury" and "causal basis of the injury" are treated as synonymous.

Defendant likewise offered no evidence which tends to show the origin of the fire. Harry Stone, the announcer, testified for defendants, and we quote from his testimony as follows:

"Q. Now, with relation to the exact program, what time did the fire start? A. Just at the conclusion of the program.

"Q. Had they ceased playing? A. They had.

"Q. I believe the musicians were engaged in putting up their instruments? A. That is right.

"Q. Now what was the first thing you noticed, Mr. Stone, that you drew a conclusion from that there was a fire, what did you see, or when? A. Well, I first saw a fire, it was a spot just about the size of your hat. It was to the right of the window, and up within a foot of the ceiling. The fire at that time was in one spot, right near the ceiling.

"Q. What was that fire in? A. In the satin, not in the draperies you understand that hung by the window, but beyond the draperies into the satin itself.

"Q. What were the draperies that hung by the window? A. They were velour or velvet, I don't know the difference between the two.

"Q. They are heavier? A. Much heavier material.

"Q. They were a different color from the satin? A. Yes, a different color.

"Q. They were green, I believe. A. Dark green.

"Q. You say you first noticed the fire, you say spark, was it a spark or a little flame? A. It was on fire, it was actually burning.

"Q. On the edge of this satin, is that right? A. It was not the edge. You understand the satin was stretched tight over the walls, and it was burning right on the wall itself.

"Q. In the satin? A. Yes, sir, in the satin, the flame had crossed over it.

"Q. The satin didn't hang in a loose fold where you could see the edge of the satin, it was burning in the folds of this satin? A. Yes, sir.

"Q. How far, as you can best estimate, was that from the window, where the fan was located? A. You mean, from the edge of the window itself?

"Q. From the edge or the center, either one, because we have the dimensions of the window. A. It was easily a foot, to a foot and a half to the right of the window itself.

"Q. To the edge of the window you mean? A. From the edge of the window, yes.

"Q. This fan, this is an exhaust fan—Was any portion of that fan that you know of projecting out in the room from the window casing, or was it set back into the window casing? A. I don't know whether I get just what you mean, the sash itself was backed in, and it was an unusually deep window.

"Q. You say unusually deep, Mr. Stone, just what do you mean, about how deep? A. Well, I don't know the exact dimensions of it, but I would say it was easily two feet.

"Q. And the fan was sitting back in that recess? A. That is right, in other words, the back of the fan would be fully six inches from a line in front of the window.

"Q. From the wall line, in other words? A. That is right.

"Q. And then the satin, of course, was on that wall line, probably an inch or two out from that? A. Yes, sir.

"Q. Were those curtains on fire at that time? A. Not at that time, no.

"Q. Now, did you see the direction in which this flame traveled, at the beginning of the fire. A. It traveled towards the fan.

"Q. Towards the fan? A. Towards the fan."

Stone was the only witness for defendant who was in the Studio when the fire occurred. Of course, under well settled rules, Stone's testimony must be disregarded on defendants' motion for peremptory instructions, insofar as it conflicts with the testimony of plaintiff's witnesses.

Whether the trial court erred in sustaining defendants' motion for peremptory instructions depends upon the application or non-application of the rule of res ipsa loquitur to the facts of the case. It is earnestly and plausibly argued by the learned and able counsel for plaintiff that this doctrine applies, and that, for that reason, the case was one for the jury to decide. In the brief for plaintiff it is said:

"The trial court erred in sustaining defendants' motion for a directed verdict and in failing to hold that the rule of res ipsa loquitur applied to the facts of this case, because the thing which caused the plaintiff's injuries was without fault of his, was under the exclusive control of the defendants, and

the injury was such that in the ordinary course of things such occurrences do not happen where the party having control exercises ordinary care.

"The trial court erroneously sustained defendants' motion for peremptory instructions, and thereby disregarded the doctine of res ipsa loquitur and erroneously assumed that defendants' attempted denial of how the accident occurred relieved the doctrine of its applicability to the case, whereas when the application of the doctrine is called for its effect and operation is not displaced or removed because testimony was offered which if accepted by the jury would have exonerated the defendants, since in such cases where the doctrine applies the sufficiency of the explanation, if any, and the credibility of the witnesses offering it, is for the jury, which may accept or reject such explanation or denial."

The propositions thus advanced are elaborated and discussed in the plaintiff's brief, but the foregoing quotation therefrom contains the substance and basis of the contention and argument for plaintiff.

"When negligence is presumed, it is because certain proven facts naturally and logically impute the absence of that degree of care required by law." Railway Co. v. Manchester Mills, 88 Tenn., 653, 657, 14 S. W., 314.

In the opinion (by Judge Lurton) just cited it is said (at page 659): "There is no natural presumption that a fire, the origin of which is unknown, was the result of the want of care of the owner or occupant of the premises of its origin."

The statement quoted was approved and applied in the case of Weeks v. McNulty, 101 Tenn., 495, 499, 48 S. W., 809.

In Railway Co. v. Manchester Mills, supra, speaking with reference to the rule above quoted from that opinion, the court said (at page 660):

"An exception to the general rule requiring proof of negligence is supposed to exist in the case of fire communicated by sparks emitted from locomotives. This exception rests upon the assumption that by due diligence in the use of the most improved machinery for the consumption of sparks, they need not be emitted, and that the emission of sparks therefore presumes negligence in the failure to provide proper spark arresters, and thus cast upon the defendants the burden of proving that its appliances are of the most approved kind. Burge v. L. & N. R. R., 7 Heis. 462. This exception, while well established in this State and in a few others, has not met with the approval of the majority of the Courts of America. It rests upon its own peculiar grounds—the duty of using most approved machinery to prevent emission of sparks, the presump-

tion that emission of sparks is prima facie evidence that such improved machinery has not been used, and upon the grave difficulty in the way of a plaintiff to affirmatively prove the character of machinery in the exclusive care and control of the defendant.''

In the case of Railway Co. v. Lumber Co., 130 Tenn., 354, 170 S. W., 591, it was held that where, in an action for destruction of plaintiff's property by fire alleged to have been set by sparks from defendants' engines, it was admitted that the fire, if set by sparks, must have come from one of two engines identified, and the evidence was conclusive that these engines were new, of the latest design, equipped with the latest improved spark arresters in good condition, and were skillfully operated, the evidence was insufficient to sustain a finding that the fire was caused by the emission of sparks from defective equipment operated by the Railroad Company.

''Negligence is never inferred from the mere fact of the injury; but the act which produced it, and defendants' negligence, and the injury must all be shown, and the nexus between them must appear in the relationship of cause and effect. . . . It (res ipsa loquitur) in nowise modifies the general doctrine that negligence will not be presumed.'' DeGlopper v. Railway Co., 123 Tenn., 633, 643, 134 S. W., 609.

There is a total lack of evidence in the record that the fan in question was defective in any respect, and there is ample evidence to the contrary. It was a twelve-inch, ventilating fan, made of steel and aluminum, and was operated by a small General Electric totally enclosed motor of one-seventh Horse Power, which was situated in the center of the back of the fan—that is, on the inner side of the fan. Both the fan and the motor were of the latest improved design and construction and were of the best on the market.

On the trial, the plaintiff, through his counsel, endeavored, mainly by cross-examination of defendants' witnesses, to develop two wholly separate and independent theories of the origin of the fire. One of these theories was that a spark or flame was generated within and emitted from the motor and set fire to cotton lint collected on the fan, and that the flame thus originated was ''shot'' into the draperies about the window and the silk and cotton batting on the wall.

The second of plaintiff's two theories of the origin of the fire was that the insulation on the ''lead cord'' between the motor and the switch had deteriorated and ''broken down,'' permitting the separately insulated wires within the cord to come in contact and thus produce a ''short circuit'' which caused a spark to ''jump'' or ''shoot'' into the inflammable draperies etc.

Neither of these theories can be treated as a proven fact on this record without drawing inferences from inferences, and such a method of arriving at a conclusion of fact is inadmissible. Railroad v. Lindamood, 111 Tenn., 457, 472-4, 78 S. W., 88.

Plaintiff's witness Blanton testified that he had seen "lint" on the piano and other furniture in the Studio, but neither Blanton nor any other witness testified that lint had ever collected on the motor or fan, and it is in evidence, from the testimony of electrical experts, that the air currents generated by the fan would prevent the collection of lint or dust on the fan or motor.

With respect to the second of the aforesaid two theories of plaintiff, there was evidence that in the course of time exposure to rain and the "elements" would cause rubber and cotton insulation to deteriorate and break down, and that it was possible for rain to blow through the aperture in which the fan was placed and reach the "lead cord" between the switch and motor; but there is a total absence of evidence that the lead cord in question was as a matter of fact broken down or in anywise defective, and there is evidence that such insulation would not perceptibly or appreciably deteriorate in six months time under the conditions shown in this case.

The defendants introduced and examined nine witnesses who qualified as electrical experts of long experience, and only one of whom (Wheeless Gambill, Jr.) was financially interested in the result of this suit. These witnesses were all subjected to a searching cross-examination most skillfully conducted.

On motion of defendants for peremptory instructions, it is the duty of the court to take into consideration such parts of the evidence introduced by the defendants as are not in conflict with the evidence for the plaintiff. 101 Tenn., 374; 114 Tenn., 187, 114 Tenn., 592; 119 Tenn., 426; 118 Tenn., 284; 136 Tenn., 402; 5 Higgins, 103, 26 R. C. L., p. 1062, par. 69-70.

It would unduly extend this opinion to review the testimony of these expert witnesses herein. We have carefully examined and re-examined all the evidence. The undisputed evidence of defendants' expert witnesses is that it was "impossible" for a totally enclosed motor of the type here involved to generate and emit a "spark" or "flame" such as that described by plaintiff and his witness Mrs. Erwin.

The undisputed testimony of these experts also shows that a "short circuit" in the lead wire would have blown out the fuse and extinguished the lights in the Studio (the motor of the fan and the lights being on the same "circuit"), and it is an undisputed fact that the lights continued to burn for several minutes after the

fire begun and while the occupants of the Studio were making their exit.

Plaintiff introduced evidence in rebuttal that the wires of the "lead cord" showed evidence of a "short circuit," and that this could have resulted from broken down insulation, resulting in contact of the wires, but these witnesses admitted that the same result could have been produced by external fire, and the undisputed proof shows that the fan was subjected to a heat sufficiently intense to melt the aluminum blades of the fan. On this testimony, it was a mere matter of surmise and conjecture as to which of the two causes, if either, produced the "short circuit," and a verdict cannot be based on conjecture. Nashville Railway & Light Co. v. Harrison, 5 Tenn. App., R. 22, 32, and other cases there cited.

There is no evidence in the record which shows the origin of the fire, or which shows the "nexus" between any negligent act of defendant and the plaintiff's injury.

In the brief for plaintiff, counsel rely upon the definition of res ipsa loquitur stated in North Memphis Savings Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 177 '198 S. W. 492), which is as follows:

> "The rule res ipsa loquitur, in its primary or distinctive sense, may be thus defined: Where the evidence shows an injury inflicted, and also the physical thing inflicting it, and that thing does not usually, or in the ordinary course, produce such a result where due care is exercised by those in charge of it, it may be inferred that those so in charge of the thing inflicting the injury failed to exercise such due care; that is, that they were guilty of negligence."

It will be observed that, as a condition of the application of the rule of res ipsa loquitur, the evidence must not only show an injury inflicted and the physical thing inflicting it, but it must also show that the physical thing inflicting the injury "does not usually, or in the ordinary course, produce such a result where due care is exercised by those in charge of it."

In the case from which the foregoing definition of res ipsa loquitur is taken, the intestates of the plaintiffs had suddenly fallen from a ladder and died while descending a man shaft in a bridge pier under construction, and the circumstances pointed to the presence of poisonous gases in the man shaft as the cause of their death. But the proof showed that, so far as witnesses of experience knew, gas had never before been known to develop in one of these shafts, and the Supreme Court approved a directed verdict for the defendant, saying that negligence could not be inferred from the failure of the defendant to adopt certain precautions which would have prevented the accumulation of gas in the man shaft, as it appeared

from the evidence that gas had never before developed in one of these man shafts, and so it was a danger that could not reasonably be foreseen. See pages 172, 176, and 191 of the opinion in North Memphis Savings Bank v. Union Bridge & Construction Co., supra.

In Memphis Street Railway Co. v. Stockton, 143 Tenn., 201, 207 (226 S. W., 187), where a student motorman sought to recover for injuries resulting from the failure of a street car brake to function, the same principle was applied. The court held that it could not "be inferred from common experience" that the bare failure of the brake to work indicated a defect which was of such a character and had existed for such a length of time as that the master knew or in the exercise of reasonable care should have known of its existence, and that the court could not say that the master knew of this defect or ought to have known of it when the character of the defect itself is utterly unknown.

In the instant case, the experienced electricians testified that they had never seen, known, or heard of a motor or fan of the type here involved setting fire to property or "shooting out" a flame such as that described by plaintiff and Mrs. Erwin.

Plaintiff's rebuttal witness R. C. McKenzie, a member of the Nashville City Fire Department, with some previous experience in electrical work, stated that he had heard of a case where the motor of a vacuum cleaner caught fire and came near burning the house; but there is no evidence that the motor of the vacuum cleaner was of the same or a similar type to the one here in question.

We are of the opinion that if plaintiff's evidence had not been lacking in the other respects hereinbefore pointed out, his case would fail for the reason that defendants, even in the exercise of due care, could not reasonably anticipate or foresee such an occurrence with a motor and fan of the type used in this Studio, and they were therefore not guilty of actionable negligence.

For the reasons stated, the plaintiff's first, second and third assignments of error, which are leveled at the action of the trial court in directing a verdict for the defendants, are overruled.

It appears from the record that, after the trial judge had, on the motion for a new trial, ruled that the suit must be peremptorily dismissed, he undertook to sustain a ground of defendants' motion for a new trial which complained that the verdict was excessive, and suggested a remittitur of $12,500 from the verdict of $15,000, and the remaining assignments of error of the plaintiff in this court, numbered four, five and six, complain of the action of the trial court in thus suggesting a remittitur.

This action of the trial court in suggesting a remittitur was inconsistent with his previous action in dismissing the suit, and was

unwarranted and of no effect, and the assignments of error directed to such ruling raise no material question and need not be considered.

It results that the judgment of the circuit court dismissing the plaintiff's suit is affirmed. The costs of the cause in the circuit court and the costs of the appeal will be adjudged against the plaintiff J. D. Martin.

Crownover and DeWitt, JJ., concur.