Thompson *et al.* v. State.

*(Nashville,* December Term, 1936.)

Opinion filed January 30, 1937.

A. V. McLane and B. H. Hagey, both of Nashville, for plaintiff in error Thompson.

Charles Embry and Jack Norman, both of Nashville, for plaintiff in error Scott.

Ned Lentz, of Nashville, for plaintiffs in error Nannie and Oakley.

W. F. Barry, Jr., Asst. Atty. Gen., for defendant in error.

Mr. Justice Chambliss delivered the opinion of the Court.

The four plaintiffs in error appeal from a conviction of arson, in the burning of a frame dwelling house and contents, located at 1725 Third Avenue North, Nashville. The fire occurred at 1:30 a. m. June 6, 1934. Thompson, Will Allen Oakley, and Madison Scott were sentenced for ten years and Owen Nannie for one year.

The first question presented under the assignments

challenging the judgment on the facts goes to the proof of the *corpus delicti*. Oakley, one of the defendants, testified definitely and circumstantially that the fire was of incendiary origin, incriminating himself and, as his associates in the crime, Thompson, Scott, and Nannie. Also defendant Nannie testified to facts definitely showing criminal burning. The insistence is that they were accomplices and that their testimony is insufficient to convict their associates without corroboration, indeed, that the *corpus delicti* must be independently established. Our examination of the record satisfies us that the *corpus delicti* was otherwise proven. Several convincing facts and circumstances were proven before Oakley testified. Nannie's testimony came later.

 The fire broke out at 1:30 on a June night. No electrical disturbances are suggested. If the house was wired at all, it was disconnected. It was a small, cheap frame house. There seems to have been no fire in the house, grate, or stove. The house was unoccupied that night, and no lamp or candles appear to have been in use. The fire when first seen was burning in a rear room. In other words, there appears no explanation of, or excuse for, the spontaneous breaking out of a fire under these circumstances and at this hour—an hour when crimes of this nature can be most readily committed, when robbery and arson have freest play. Witness Ferrell, living next door, heard an explosion and saw a flash, and then a second explosion, followed by the fire inside the rear of the house. He put in the alarm. Capt. Kesner, of the fire department, found the house vacant, and burning fast. He testified that commonly when the fire is from defective wires the fire is slow, with much smoke; that it appeared to have inflammable material in the

rear room where the fire was, and as he opened the door there was "a flash." This witness also testified that the two front rooms were bare of furniture, suggesting that the occupant had removed the furniture in anticipation of the fire, as it otherwise appeared he did do. A witness proved that Owen Nannie had shortly before moved in there and that night was away. The proof is that $750 of insurance was being carried on furniture in this shack—obviously a grossly excessive amount. This is always regarded as a distinct badge of incendiarism. And on this cheap dwelling, which sold for $500, insurance was outstanding of $1,750, again so grossly excessive as to support the charge of purposeful burning. Here was a strong motive clearly shown. We think the circumstances leave little doubt that the fire was incendiary. It is well settled that "all of the elements constituting the *corpus delicti* may be proven by circumstantial evidence." *Ashby* v. *State,* 124 Tenn., 684, 139 S. W., 872, 875; *Copley* v. *State,* 153 Tenn., 189, 281 S. W., 460. But here we have a confession, which, taken together with this circumstantial evidence, abundantly sustains the verdict on this issue. And it may be also said, in response to a criticism on the point, that the circumstantial evidence referred to preceded the testimony of Oakley, who made a confession on the stand, as said to be proper in *Ashby* v. *State, supra.* Now Oakley testified that he carried cans of gasoline and placed them in the rear room of this house a day or so before the fire, and Nannie tells of the can or cans being brought there. This ties in with the evidence of the breaking out of the fire already mentioned. The circumstantial evidence and this direct testimony clinch the case on this question.

It is next urged that the evidence does not sustain the

conviction of Thompson and Scott as parties to the conspiracy to burn this house. It is denied that they had any guilty part in the crime. Here again, although the testimony of Oakley and Nannie directly connects Thompson and Scott with the crime, charging them with being both instigators and beneficiaries, and with having played important parts in its accomplishment, giving circumstantially many details, it is urged that these men are accomplices without supporting an essential corroboration. The case on the facts, therefore, narrows to the inquiry whether the record contains admissible corroborative evidence of the testimony of Oakley and Nannie implicating Thompson and Scott. We consider then this question.

For a number of years, Thompson, assisted by Scott, has followed the occupation of fire insurance adjuster in Nashville and surrounding territory. He is a man of wide experience in this line and was for a time connected with the fire marshal's department. This has significance as negativing the conclusion that he could have been unaware of the cumulative effect of the many suspicious circumstances which, according to his own admissions, surrounded this transaction and his dealings with Oakley, who was the most active party to the crime. By the very nature of his calling and his very wide experience, it is impossible to conceive that he would not have readily detected the fraudulent nature of the transaction in which he played a large part. It appears that he knew Oakley well, and previous to this particular transaction in the spring of 1934 had had various and sundry dealings with Oakley, some of them in which fire losses were involved. Oakley had for some years made his headquarters at Thompson's office, getting his

mail there and using the telephone and desks and having frequently been instrumental in securing for Thompson engagements to adjust losses. Yet Thompson testifies that he knew Oakley to be thoroughly disreputable and to have been involved in more than one criminal transaction.

At this point, a summary of the testimony of Oakley, and incidentally of Owen Nannie, becomes relevant. He says that, about the beginning of the year 1934, it was agreed between him and Thompson, he says at Thompson's suggestion, that they would locate a cheap house and purchase it, partially furnish it, insure it, and then burn it; that this they conspired to do, Thompson to play the part of adjuster and collect the money and divide it between them and Thompson's associate, Scott. That pursuant to this arrangement they agreed upon the small frame dwelling house at 1725 Third Avenue North, owned by one Hyde; that his house was purchased in the name of Oakley for a consideration of $500, of which $50 was paid in cash, and for the balance installment notes given. The house at that time was insured for $400 and this policy was left with Hyde, the holder of the balance purchase-money notes. The deed was executed February 20th, reciting this consideration, and placed of record. Pursuant to their understanding, Oakley then induced a brother-in-law, R. B. Davis, to agree to become a purchaser from Oakley, for a recited consideration of $1,750, of which he was supposed to pay in cash $50, assuming the $450 to Hyde, and execute installment notes for the difference. This was carried out, and the deed executed to Davis on the 19th of March. However, it appears that no money passed from Davis. Meanwhile, no change had taken

place in the property except that some slight repairs, a little painting and papering and incidental carpenter work, had been made. ·Oakley testifies that the $50 cash payment made to Hyde was supplied by Thompson, as he had no funds whatever. The record fully shows, not only that Oakley was without any means at all, but that this was well known to Thompson, who himself says that he from time to time let Oakley have a few dollars here and there, although he denies furnishing him with this particular $50. The record contains no suggestion of any other source from which Oakley could have obtained this money. Thompson not only shows that Oakley was without means, but that he knew that Oakley could not borrow money on his own name or account. Following the conveyance to Davis, $1,100 additional insurance was obtained, the result being that the place for which $500 had been paid was covered by $1,500. About this time, Oakley arranged with Owen Nannie, on the promise that he would give him $100 for his part in the transaction, to move into the house and pretend to be a tenant of Davis, the ostensible and record owner. This man Nannie lived in that general vicinity, and appears to have been wholly without means or financial responsibility. He had a small amount of furniture which he had purchased from the Lusky Furniture Company on installments at the price of $70, and on which he had paid $5 at that time, and this he moved into the house. Thereupon, as a basis for insurance upon the furniture in the house, Oakley contacted a Mrs. Waggoner, who had advertised some secondhand furniture for sale, and he and Scott went to inspect it with a view to buying it, with the result that she sold it to Oakley for $55, and this secondhand furniture was moved into the house occupied

by Nannie. It appears, not only from Oakley's testimony, but from Scott's own admission, that he (Scott) furnished the money to pay Mrs. Waggoner, and that he went with Oakley and turned it over to him in the presence of Mrs. Waggoner, who so testifies. Scott's explanation is that he was loaning the money to Oakley, and he says he took a note for $75, purporting to retain a lien, but no note could be produced.

It next appears from the testimony of both Oakley and Nannie that Oakley carried to the house and placed in the rear room a quantity of gasoline in cans. Nannie says that he well understood to what use this would be put, although he denies that he himself fired the house. Oakley testifies with much circumstantial detail that he bought this gasoline at the suggestion of Thompson, who furnished him $4 to pay for it, and carried it in cans furnished by Thompson from Thompson's residence, and left it at the house, with an understanding with Thompson that he (Thompson) would see to it that the place was fired. Meanwhile, Owen Nannie was tipped off to be away from the house at a given time and, accordingly, he moved the day before the fire to another place in the vicinity and carried with him all of his furniture except an iron bed and a cooking stove. It will be recalled that the fireman found the two front rooms of the house empty. Meanwhile Oakley had contacted a young man named Ratleph, who hung around with this crowd, selling furniture and insurance, and arranged with him to procure a policy of $750 insurance on this furniture. This was on the 20th of May. Ratleph says that he and Oakley went up to Thompson's office and he stood outside waiting while Oakley and Thompson conversed; that he saw Thompson put his hand in his

pocket and give Oakley something; and that Oakley then rejoined him and that they went down the street together to the insurance office, where he paid $5.60, which Oakley handed him, as a premium on the policy, which was given to Oakley. The policy was made out in the name of Owen Nannie, and it is quite evident that Ratleph posed to the insurance agent as Nannie. Ratleph says that they then went back up to Thompson's office and Oakley took the policy in and left it there. Thus the matter stood until the early morning of June 6th, some fifteen days later, when the fire occurred.

A short while after the fire, Scott appeared on the scene and went to the house where Nannie was spending the night and called him out and there had Nannie execute to Thompson and Scott, or the Thompson Company, a contract authorizing them to adjust his fire loss. Nannie was told by Scott to report at Thompson's office the next morning to make out, or sign, proofs of loss. He did so, and an elaborate list was made up in that office of furniture supposed to have been destroyed in this fire and to have been a total loss. This typewritten paper was actually prepared, or put on the machine, by the wife of Mr. Thompson, who acts in the office in the capacity of a bookkeeper and general office assistant. She is known to be a woman of considerable experience, before marrying Thompson in 1930, in matters of accounting. This' typewritten list is exhibited and it is, of course, too obvious for dispute that a man as ignorant and illiterate as Owen Nannie apparently is, could not have furnished this detailed data. It consists of three legal cap size sheets, room by room, with specific values against each of approximately one hundred and fifty articles, and

footing in the loss and damage column $1,074.51. Nannie testifies that he had really nothing to do with the making up of this list, merely signing whatever they told him to sign, and Mrs. Thompson says that he was over there but one time giving in the information. However, it appears from the testimony of Mr. Thompson and Oakley and Nannie himself that he went back two or three times and was drilled by Mr. Thompson and others as to how he should conduct himself and what he should say when they went before the adjuster for the insurance company who, by the way, had died before this trial.

After some delay, settlements were arrived at which resulted in the collection of $410 on the furniture and $1100 on the house. Numerous conferences were had between the parties, Oakley, Thompson, and Scott, between whom, according to Oakley, the net proceeds were split, according to agreement, in equal parts. Thompson and Scott insist that they got only a 10 per cent commission, but it is significant that the disbursements, in the main, which they claim to have made are not evidenced by any memoranda that can be produced. It is conceded that they paid out of the furniture insurance the balance due the Lusky Furniture Company of $65 and gave to Nannie a check for $25, this payment being evidenced by check. There is no pretense on the part of Thompson and Scott that Nannie, who was supposed to own the furniture, received more than this; and it is significant that the payment to Lusky and the $25 paid to Nannie, together with a deduction of a few dollars which Thompson claims to have loaned Nannie, do foot the $100 which Oakley and Nannie testify was agreed to be paid him as a consideration for his part in the transaction, thus corroborating their story. Thompson claims that the bal-

ance was paid, either directly to Oakley or in repayment of advances or loans made by him for Oakley or for which he was responsible to Oakley. However, there are no book entries to support this, and no adequate or satisfactory memoranda.

Very much the same course was pursued with respect to the $1,100 collected on the house. Out of this the $450 balance due on the obligation to Hyde was deducted and paid to him. It appears that a check for $87.50 was drawn payable to R. B. Davis, and it is said that this, together with $12.50 which had been given him in cash, made the $100 which Davis was to receive for his part in the transaction. However, it seems that the check was delivered to Oakley and he got the money on it, indorsing the name of Davis thereon. And, in order to wind up the transaction, Davis was required to execute a deed conveying the property to Scott for a recited consideration of $250 cash, which Scott says he paid to Oakley. At any rate, it is not contended that the money went to Davis, and Oakley insists that it did not go to him. This again, according to Scott, was paid in cash, so there is no memorandum evidence of it. Oakley testifies, and we think the record as a whole supports him, that in the division of the spoils Scott agreed to take the title to this lot on which the house had stood, at a valuation of $125, and that this was charged to Scott in dividing the net proceeds among them, one-third to each. As before stated, Thompson and Scott claim that they got none of the money, except only their commission of 10 per cent, and undertake to testify as to how much in cash they paid to Oakley and how much they paid out for him on loans and other items. But we think it distinctly significant that this experienced and intelli-

gent firm of adjusters should have made such a settlement without preserving any paper record whatever. An inference clearly arises of fraudulent manipulation and we are disposed to accept, as the jury did, the story told by Oakley as to the division of this fraudulently obtained fund. And it is also noted as significant that, while this deed from Davis to Scott was executed as of the 1st day of August, and delivered to Scott at that time, according to his own admission, he withheld it from record until this prosecution was well under way.

Of course, if credit is to be given to the circumstantial testimony of Oakley and Owen Nannie, there can be no question whatever of the part in the conspiracy played by Thompson and Scott, and of their active participation in the fraudulent burning of this property. While the indictment is directed to the burning of the house, the evidence touching the furniture is pertinent and persuasive of guilt.

■ It is impossible within the proper limits of this opinion to deal in detail with all the circumstances and facts developed by the testimony in this case, which covers nearly two thousand pages. The following matters, among others, appear to us to corroborate the testimony of these two witnesses, with particular reference to the participation and guilty knowledge and intent of Thompson and Scott:

(1) The adjustment of this loss and collection of this insurance could not have been honestly made. Notice was plainly given by the records and by any sort of casual inspection that the insurance was grossly excessive, both on the furniture and the dwelling. This stamps with bad faith the conduct of these adjusters. (2) The distribution of the funds to neither Nannie nor Davis,

the insured, but to Oakley, known by them to be utterly without means or character, together with their very apparent inability to account satisfactorily for all of the money, even on the theory that they paid it out, either to or for Oakley. (3) What has been said of the collection of the insurance on the house applies even more forcibly to the collection of this obviously fraudulent claim on the furniture, and this elaborate statement of loss prepared in the office of Thompson, as already suggested, could not conceivably have been based on data furnished by Nannie. (4) It was definitely proven that Thompson arranged with the dealer to deliver to Oakley the paint and paper which he used in making the repairs on this house, in putting it in shape for insurance, and Thompson admits this and also that he paid the bill. It is true that he undertakes to explain that he thought it was to go on another house occupied by Oakley, but we think the circumstances do not support this. (5) Reference has been made to the admitted fact that along about this time Thompson made loans to Oakley, and he must have known that Oakley had no funds to loan to Nannie, or with which to make any payments whatever. (6) And we think the conveyance back of the property to Scott for a falsely recited consideration from Davis, and the failure to register the deed, are distinct badges of fraud, directly supporting the testimony of Oakley. (7) It appears from the testimony of Ratleph, who was used to purchase the insurance on the furniture, that, while Oakley furnished the money, he got it from Thompson for that purpose. (8) The record discloses various attempts on the part of Thompson and Scott to suppress the facts and to conceal their dealings with Oakley and the other parties. (9) It is sig-

nificant and corroborative that Scott went with Oakley to buy the furniture from Mrs. Waggoner, and furnished the money. (10) It is also significant that Scott appeared on the scene of the fire shortly after, and that at 3 o'clock in the morning he saw Nannie and procured from him the adjustment agreement. The record shows that he had spent most of that evening in the home of Thompson, and we think the circumstances suggest that he was aware that the fire was scheduled to occur and arranged his movements accordingly.

(11) A Miss Beasley, who worked in a real estate office and drew the deeds from Hyde to Oakley and then from Oakley to Davis, testifies that Oakley worked out of Thompson's office and that she talked with Thompson along about this time, and whenever she needed to get Oakley she got him through Thompson and that when Oakley came to their office he would come from Thompson's office. (12) Thompson made much of a claim that he was in disfavor with the fire marshal's office, and insisted that he was being persecuted by that office and by the insurance companies, and that this had brought about a great reduction in his business, which had fallen off. We think this tends to support the theory of the State that Thompson and Scott were conducting themselves and their business as adjusters improperly, and that a suspicion, at least, was widespread that they were responsible for the abnormal number of fires which it appears from the record had been taking place prior to the institution of this prosecution, and, in this connection, it is shown that the number of these fires had greatly fallen off. Further reference will be briefly made to this theory of the State that Thompson and Scott had been responsible for much and widespread incendiarism

in the Nashville territory, and that this is but one of many cases.

Enough has been said to indicate our conclusion that there is no preponderance on the facts of this record against the verdict, and the assignments so directed are overruled.

In addition to the assignments challenging the sufficiency of the evidence, numerous other assignments challenging the legality of the proceedings are made. We briefly deal with those which we conceive to require discussion.

■■ Much complaint is made of the refusal of the trial judge to grant a severance to Thompson and Scott, in view of the alleged antagonistic attitude of their co-defendant, Oakley. Learned counsel concede that this is a matter, under our holdings, in a large measure within the discretion of the trial court. And it was emphasized in the recent case of *Woodruff* v. *State,* 164 Tenn., 530, 51 S. W. (2d), 843, that the exercise of this discretion by the trial judge will not be accepted as a sufficient ground for reversal, unless it appears that the defendants were clearly prejudiced thereby, citing *Railroad Co.* v. *Johnson,* 114 Tenn., 632, 88 S. W., 169. We are unable to see that such prejudice resulted in this case. If a severance had been granted and Thompson and Scott had been put on trial before Oakley, it is clear that the State could have used Oakley as a witness with equal effect and that his testimony would have been as directly damaging to these defendants as it was on the trial had. It is urged that Oakley, being a codefendant in the trial, had the right, which he exercised, to remain in the courtroom, but it appears that Oakley was introduced and testified before the defendants, and before

any witnesses gave testimony which could have assisted or informed him, or in any wise affected the giving of his testimony. Moreover, counsel for Thompson and Scott were given every opportunity to cross-examine Oakley in this case that they would have had under a separate proceeding. A separate proceeding would have doubled the cost to the State of this prosecution and perhaps in other ways been harmful. The result of the trial shows that Oakley received punishment identical with that given Thompson and Scott, and received no immunity because of his testimony. It cannot fairly be assumed that in giving his testimony he was more unfavorable to Scott and Thompson than he would have been on a separate trial. It does not appear that Thompson and Scott were prejudiced in the matter of the selection of the jury by this joint trial with Oakley. Their right to challenges was in no way impaired. We are unable to say that the learned trial judge abused his discretion in this regard, and this, under all our cases, is in test.

Another complaint most earnestly presented is that evidence was admitted that Thompson had participated in one or more similar transactions in which secondhand furniture had been bought and put into a house soon thereafter destroyed by fire, etc. In the first place, much of this testimony with respect to other transactions was brought out on the cross-examination of Thompson and Scott, in which, while denying guilty participation, they admitted adjustment of numerous fires as to which suspicion was aroused. But we think there can be no possible doubt that it was competent for the State to make the proof complained of, supporting the theory of the State that Thompson had guilty

knowledge and intent in connection with the particular transaction for which he was being tried. If it could be shown that in other cases he had participated in the purchase of secondhand furniture and in the procuring of over insurance and in the division of the spoils, it would clearly throw light upon the meaning of his conduct in the instant case and demonstrate that he was not acting innocently, but in line with a fraudulent course of conduct. *Woodruff* v. *State, supra,* discusses this question and cites and quotes from the leading case of *Defrese* v. *State,* 50 Tenn. (3 Heisk.), 53, 8 Am. Rep., 1, and *Mays* v. *State,* 145 Tenn., 118, 238 S. W., 1096. Moreover, upon an examination of this whole record, we are not of opinion that the evidence offered by the State of this character was in any sense determinative, or, indeed, really affected the result. We are satisfied that conviction would have followed without the introduction of this evidence.

In addition to the expressions in our own cases, above cited, we quote and approve the following statement of the rule from Wharton's Criminal Evidence, vol. 1, pp. 527-530:

"Sec. 352. To show plan, scheme, or system. Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant's guilt of the crime charged. Subsequent as well as prior collateral offenses can be put in evidence, and from such system, identity or intent can often be shown. The question is one of induction, and the larger the number of consistent facts, the more complete the induction is. The time of the collateral facts is imma-

terial, provided they are close enough together to indicate that they are a part of the system. A man may be honestly mistaken and have no fraudulent intent if a transaction stands alone, but the probabilities of an honest mistake diminish as the number of similar transactions, indicating a scheme or system, increases. . . .''

Many complaints are made of alleged errors in the admission of testimony, the point more particularly stressed being that witnesses were permitted to relate statements made by one of the defendants incriminating another not present at the time. We have searched the record with care and we think it apparent that the trial judge exercised unusual precaution in this regard, repeatedly instructing the jury in the progress of the trial that such statements were to be considered only with respect to that defendant with whom the conversations were had or in whose presence the purported statements had been made. We find no error in this regard.

It is also urged that there was a fatal variance between the proof and the indictment, in that the indictment was for arson and the proof tended to show a conspiracy to burn for the purpose of insurance, which, it is insisted, is a separate and distinct felony. Plaintiffs in error were convicted under the second count of the indictment which charges that they ''did cause to be set afire and burn by aiding, counseling and procuring some one to the said grand jurors unknown, to set fire' to and burn a certain building, to-wit: The one story frame building at 1725 Third Avenue, North,'' etc. This count of the indictment charges the offense now prescribed in section 10893 of Williams' 1932 Code, as amended by chapter 151 of the Public Acts of 1933 (section 1) and brought into Williams' Annotated Code of

1934. Under this statute it is immaterial for what purpose, or with what object, the house was burned, and no variance can be said to result from the mere fact that the proof, not only shows the defendant to have been guilty of the offense as charged in the indictment, but goes further and supplies the motive which actuated the commission of the crime. This assignment must be overruled.

As we understand the exhaustive brief of learned counsel, these are the questions which are material and necessary to be passed upon, and this memorandum opinion will not be further extended. We find no reversible error, and the judgments are affirmed.