# LACKEY v. METROPOLITAN LIFE INS. CO.— 206 S. W. (2d) 806.

Middle Section.  May 19, 1947.

Petition for Certiorari denied by Supreme Court, December 8, 1947.

Jay G. Stephenson, Hilldrop & Mayfield and Jay C. Evans, all of Nashville, for plaintiff.

John J. Hooker and Moore & Ewing, all of Nashville, for defendant.

FELTS, J.  Mr. Joseph L. Lackey, a member of the Nashville Bar, sued the Metropolitan Life Insurance Company for $100,000 damages for conspiring with its representatives to slander him, to have him disbarred, and to destroy his business, reputation, and character; and for a "campaign" of overt acts continued over two and one-half years in carrying out the conspiracy.

This suit was brought and the declaration filed December 10, 1940. Defendant demurred because the slanderous words were not stated with enough particularity, the conduct charged was not sufficiently specified, and the slanderous words by defendant's attorney were privileged. The trial judge sustained the demurrer and ordered the suit to be dismissed unless plaintiff amended or supplemented his declaration so as to state a cause of action within 30 days.

On December 6, 1941, within the 30 days allowed, plaintiff filed an amendment and supplement containing twenty-eight counts averring numerous slanders and other acts done to carry the conspiracy into effect. Defendant again demurred, insisting that the amended and supplemental declaration constituted a new suit upon twenty-eight separate and distinct new causes of action of slander, all of which were barred because such slanders had been uttered more than six months before the filing of the amended and supplemental declaration. The trial judge sustained the demurrer and dismissed plaintiff's suit.

The Supreme Court reversed this judgment of dismissal and remanded the cause. In its opinion by Mr. Justice DeHaven, filed January 9, 1943, unreported, the Court held: "The gravamen of the declaration was the conspiring of defendant with its representatives and others to destroy plaintiff in his profession, character and reputation"; that this action for conspiracy was not converted into an action of slander by the filing of the amended and supplemental declaration; and that such declaration was no departure from the original cause sued on, did not constitute a new suit involving twenty-eight separate and distinct new causes of action of slander, but was a specification of slanders and other acts done to effectuate the conspiracy.

Upon the remand defendant pleaded "not guilty," but was permitted to withdraw this plea and file another demurrer, which was overruled. Plaintiff was allowed to amend by alleging the object of the conspiracy was "to defame, injure and destroy plaintiff's good name, character, reputation, and standing both as an individual and as a practicing lawyer," and by alleging additional overt acts, including efforts to have him disbarred, and the filing of numerous statements in court libeling him, which statements, it was averred, were not privileged because malicious and not material and which had been judicially determined to be "false and untrue."

There were a number of motions and counter-motions, including a motion by defendant to require plaintiff to file "a new and better statement of his cause of action." Plaintiff moved to strike this motion. The trial judge overruled plaintiff's motion and sustained defendant's motion. Plaintiff refused to plead further, and the court dismissed his action.

The Supreme Court again reversed and remanded. In its opinion by Mr. Justice Neil, filed January 8, 1944, unreported, the Court held its former opinion was "the law of this case," and re-affirmed "our former holding that the gravamen of the wrong complained of is the alleged conspiracy to injure the plaintiff." After pointing out that great latitude is allowed in setting out the particular acts from which the conspiracy is to be inferred, the Court went on to say: "Adverting now to the averments in the original declaration and subsequent amendments, it seems clear that the wrong complained of consists in the averment that defendant and its agents conspired to have plaintiff disbarred from practicing law and to injure him in his profession. It was not necessary to state the names of all alleged conspirators where the names of two or more are given and others who may be unknown. It is essential that certain overt acts were committed and some one or more of these should be alleged, but every act need not be averred to the point of showing that it fits into and becomes a necessary part of some other act. We think any evidence which has a natural and apparent tendency to establish the ultimate issue of conspiracy is relevant. The limit, however, to which circumstantial evidence may be admitted must rest within the sound discretion of the trial judge, who must determine the objects and purposes for which it may be offered. If the overt act is not clearly set forth in the declaration, then proof of it is admissible only when it is connected with and related to some act that is averred. Such acts and words, considered in connection with other acts, may be competent as tending to show purpose as well as malice. . . ." (Op. pp. 6, 7.)

Upon the second remand defendant filed a plea of "not guilty" and the case was tried before the Honorable Wallace J. Smith, circuit judge, sitting by consent and by interchange in the place of the regular judge, the Honorable E. F. Langford, and a jury. The trial was begun March 22, 1944, and consumed more than thirty days. The jury were unable to agree, a mistrial was entered, and the jury discharged.

Defendant moved the court to set aside the order of mistrial, to grant a new trial, to direct a verdict for defendant, and to dismiss plaintiff's suit, upon the ground that the court had erred in overruling defendant's motion for a directed verdict at the close of all the evidence. On April 27, 1944, the trial judge took this motion under advisement and continued it from term to term. On February 24, 1945, he sustained the motion, directed a verdict, and dismissed the suit.

Plaintiff moved for a new trial, which motion was taken under advisement and overruled August 25, 1945. The trial judge filed a written opinion, which was made part of the record and in which he stated these reasons for his action: "Considering the entire evidence in the case, I am of the opinion that a conspiracy was not proved, and that plaintiff was engaged in the unethical practice of the law."

Plaintiff appealed in error and has assigned a number of errors. This case was heard and elaborately argued in this Court on December 16, 1946; and counsel for both sides were allowed further time in which to prepare additional briefs. Such briefs were later filed and the record was passed to us. It is quite voluminous, consisting of twenty-six volumes, with numerous documentary exhibits sent up in the original, together with a number of full briefs by able counsel for both parties.

Plaintiff's first assignment is that the trial court erred in setting aside the order of mistrial, in directing a verdict for defendant, and in overruling plaintiff's motion for a new trial and to reinstate the cause on the trial docket; and that this action was erroneous because there was material and determinative evidence to take this case to the jury and to support a verdict for plaintiff. That is the determinative issue before us.

■ In view of the argument in the briefs, it seems well to recall the rule, so often stated in numerous cases, by which both trial courts and appellate courts must be governed in determining a motion for a directed verdict. That rule is based on the constitutional right of trial by jury; and it has been fashioned so as to preserve that right and at the same time to administer the common law separation of function by which the jury try the facts and the judge the law. "There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried." Tyrus v. Railroad, 114 Tenn. 579, 594, 86 S. W. 1074, 1077; Brenizer v. Nashville C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Osborn et al. v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510.

■ As said so often, this rule requires trial judges and appellate judges, in considering a motion by defendant for a directed verdict, to look to all the evidence, to take as true the evidence for plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for plaintiff, to allow all reasonable inferences from it in his favor; and if then there is any dispute as to any material determinative evidence, or

any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 556-557, 249 S. W. 984; Walton v. Burchel, 121 Tenn. 715, 723, 121 S. W. 391, 130 Am. St. Rep. 788; Life & Acc. Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Osborn et al. v. City of Nashville, supra; Tennessee Cent. Ry. Co. v. McCowan, 28 Tenn. App. 225, 188 S. W. (2d) 931; Poole v. First Nat. Bank of Smyrna, Tenn. App., 196 S. W. (2d) 563, 567-568.

■■ Reference is made to this language in our case of Martin v. Braid Electric Co., 9 Tenn. App. 542: "On motion of defendants for peremptory instructions, it is the duty of the court to take into consideration such parts of the evidence introduced by the defendants as are not in conflict with the evidence introduced for plaintiff" (9 Tenn. App., at page 558). This is true only when such evidence comes from a witness whose credibility is not an issue for the jury. If such witness is contradicted, impeached, or interested in the result, his credibility is an issue for the jury (Poole v. First Nat. Bank of Smyrna, Tenn. App., 196 S. W. (2d) 563, 568-570) and his evidence cannot be considered, but must be discarded, in determining whether a verdict should be directed for defendant.

With this rule in mind, we have given full consideration to all the evidence. So great is the mass of it, it is not possible, within permissible limits of a judicial opinion, to do more than to summarize the salient facts and circumstances tending to evidence the conspiracy charged, some of the overt acts in furtherance thereof, and the resulting harm to plaintiff.

The gist of the conspiracy charged was that defendant had outstanding a great number of old lapsed industrial

insurance policies; that by a series of "concession" letters defendant had declared cash surrender values for such policies which were not shown by the policies and of which the policyholders were not notified; that great numbers of such policyholders employed plaintiff as attorney to collect for them such cash surrender values, and upon defendant's refusal to pay, he was bringing a large number of suits against defendant to recover such values; that, for the purpose of stopping him from doing this, defendant entered into a conspiracy with its local managers, Joseph I. Lasky and W. L. Mousette, its assistant manager, H. G. Bland, its attorney, Mr. Garland S. Moore, and other agents; and that the intent of this conspiracy was to slander plaintiff, to have him disbarred, to ruin his business, and to destroy his good name, character, and reputation and his standing both as an individual and as a practicing lawyer.

It appears from the evidence that defendant has been issuing industrial insurance policies since before 1907. Such policies are usually in small amounts with small weekly premiums. The costs to the insured and the profits to the insurer are much greater in industrial insurance than in other forms of insurance. The policies are issued largely to the poor, the ignorant, and the shiftless, a very great per cent of the policyholders being Negroes. The ratio of lapses is much greater in industrial insurance than in other kinds of insurance. It is said that only about 5 per cent of industrial policies are held until death or expiration, nearly 95 per cent being terminated mostly by lapses. John Ise, Economics (1946 Ed.), p. 294, referring to the findings of the Temporary National Economic Committee, Monographs Nos. 28, 37. Large numbers of the poor and the ignorant pay on such

policies for a number of years, become unable to carry them further, let them lapse, and never get any money benefits from the insurance.

The earlier industrial policies issued by defendant had no cash surrender values. Some of the later policies had such values after premiums had been paid for ten years or longer, and some still later had such values when the premiums had been paid for shorter periods. By a series of concession letters issued at six-month intervals, beginning in May 1935 and ending in December 1938, defendant did what it calls ''retroactive liberalization'' of its old industrial policies. It declared cash surrender values for them, under conditions stated, including old lapsed policies. These concession letters were sent to defendant's local managers, or its field force, and to the commissioners of insurance in the states in which defendant was issuing industrial insurance. Such letters, however, were not sent to the policyholders nor were they otherwise notified, nor was any publicity given to these concessions until about the time this suit was brought. On the contrary, the field force was specially instructed that they ''must make every proper endeavor to prevent the unnecessary cash surrender of insurance.'' Ex. 5 to Test. of Smith.

Defendant claims to have made these concessions to its policyholders voluntarily and without legal obligation. Evidence for plaintiff is that it did it to avoid income taxes. However this may be, it does appear that defendant, the largest insurance company in America, with assets of more than $6,600,000,000, and with probably the largest income, paid no income taxes at all for the years 1937, 1938, and 1939.

In 1937 plaintiff's brother, I. Lunsford Lackey, who had some knowledge of the insurance business, learned

about these concession letters, and decided to go in business as an insurance adjuster to investigate and adjust the claims of policyholders for the cash surrender values under these concessions. He paid the privilege tax under the statute for insurance adjusters, and opened an offce in Nashville under the name of the Insurance Adjustment Bureau. He began to advertise and solicit policyholders to bring in their old lapsed policies and to employ him to investigate the "hidden values" of such policies and to collect the sums that might be due thereon. Large numbers of people brought their policies to his office and employed him to collect the cash surrender values.

He began to write letters to defendant at its local offices, advising it that the policyholders had employed him to collect the cash values, giving the name of the policyholder and the number of the policy, and asking defendant for its forms on which to furnish proof of claims. But defendant's local agents declined to deal with him and refused to reply to any of the letters. They took this position "upon the instructions of the Company." Its general counsel, Mr. Harry Cole Bates, in a letter dated November 16, 1938, gave this reason for the Company's attitude: "The position of the Company is briefly, that it is prepared, so far as it properly can, to discourage anyone from attempting to collect fees from its policyholders for securing from the Company that to which they are entitled and which the Company is willing and glad to pay to policyholders without charge and without the interposition of any third person."

Upon the company's refusal to pay the claims of the policyholders, I. Lunsford Lackey would suggest to the

policyholders to employ a lawyer to bring suit. The claims usually being for small sums, the lawyers generally were not interested. He recommended a number of young lawyers, all of whom except plaintiff declined to handle such claims. Large numbers of policyholders employed him, and he began writing letters advising that he had the claims, giving the name of the policyholder and the number of the policy, and calling on defendant for blank forms on which to make proof of the claims.

Acting on defendant's instructions, its local agents declined to deal with plaintiff and refused to answer any of his letters. Great numbers of the policyholders went themselves to defendant's local offices, and asked it to pay them the cash surrender values and it refused to pay. Many of the policyholders went before they had employed plaintiff, and defendant refused to pay them the cash surrender values; and many went after they had employed plaintiff, and were likewise refused payment by defendant.

Some twelve policyholders who had asked defendant for the cash surrender values and had been refused payment so testified in this case. Some thirty-five other witnesses were present to testify to the same effect, but their testimony was excluded. It appears that they would have testified to slanders of plaintiff by defendant's agents, which slanders were similar to those in the twenty-eight instances set out in the declaration. The ground of the exclusion of the testimony of these witnesses was that such slanders had not been set out in the declaration.

This ruling seems contrary to the former opinions of our Supreme Court in this case and contrary to the gen-

eral rule which allows evidence of similar instances of a defendant's conduct to show the plan, scheme, or system under which he operated. Thompson et al. v. State, 171 Tenn. 156, 172-174, 101 S. W. (2d) 467; Schoolfield et al. v. Bean, 26 Tenn. App. 30, 58, 167 S. W. (2d) 359. Such evidence was admissible also "to show purpose as well as malice" (former opinion of Supreme Court, by Mr. Justice Neil).

Upon defendant's refusals to pay its policyholders the cash surrender values, plaintiff began bringing suits for them against defendant. Many such suits were brought in the general sessions courts. Defendant, its agents, and attorney, Mr. Moore, appeared and defended, denying defendant was in anywise indebted to the policyholders. The cash surrender values due were not shown in the policies or by the concession letters. It was more or less of a problem for an actuary to determine such values. Such being the case, the plaintiffs in those suits were unable to prove the amounts owing by defendant. A large number of the suits were dismissed, and defendant thus avoided payment of the cash surrender values to its policyholders.

Some time after plaintiff began to bring such suits against defendant, one of its attorneys, Mr. Garland S. Moore, came to plaintiff, charged him with unethical conduct, and told him if he did not quit bringing such suits against defendant, Mr. Moore would resign from the Grievance Committee and would undertake to have plaintiff disbarred. Such a disbarment proceeding was later instigated. This will be more fully referred to hereafter. About the same time defendant, by its agents and attorney, filed a bill in the Chancery Court, Part I, of Davidson County, seeking to enjoin plaintiff from

404

bringing any more such suits against defendant. The chancellor denied the injunction and dismissed the bill.

Plaintiff began to bring these suits in the circuit court and, upon defendant's denial of liability, began to file in such suits petitions for discovery. In many of these suits defendant pleaded in abatement that the amount involved was less than the jurisdictional amount of the circuit court, and many such suits were dismissed and defendant thus avoided payment of the cash surrender values to its policyholders in such cases. See Metropolitan Life Ins. Co. v. Bradley, 178 Tenn. 317, 157 S. W. (2d) 829; Chrisman v. Metropolitan Life Ins. Co., 178 Tenn. 321, 157 S. W. (2d) 831. In other circuit court cases the defendant and its agents and attorneys demurred to the petitions for discovery upon numerous grounds, among others, that it would be a breach of professional confidence to require said agents to answer the petitions for discovery and to disclose what it might owe its policyholders.

The circuit courts overruled these demurrers and required answers to the petitions for discovery. At that time plaintiff had some 150 or 200 cases against defendant pending in the circuit and chancery courts of Davidson County. Defendant's agents and attorneys went to plaintiff's clients in those cases and made compromise settlements with them, and paid the amounts directly to them, without plaintiff's knowledge or consent.

In making these settlements defendant's agents uttered many of the slanders of plaintiff sued for. Such slanderous statements were not always the same but they followed the same general pattern. Defendant's agents represented to the policyholders, plaintiffs in the 150 or 200 pending suits referred to, that it was unnecessary to

bring such suits; that defendant would have been glad to pay without suit; that plaintiff had performed and could perform no service for those policyholders and was entitled to no fee from them; that defendant was paying them upon the condition that they would not pay him any fee; that he was a "jack-leg lawyer," a "shyster," a "crook," a "thief," a "robber," was "robbing and beating policyholders out of their money"; and that if they let him collect any money for them he would keep it all.

At the time of making these settlements defendant's agents took a large number of affidavits from these policyholder-plaintiffs to use against plaintiff in these suits and also in the disbarment proceedings. Most of these policyholder-plaintiffs were poor and ignorant and had signed the pauper's oaths to the summons in bringing those suits. But defendant's agents by making the payments to them procured a great number of them to make affidavits that they had not employed plaintiff and had not authorized the suit.

Many of these affidavits were taken at the local office of defendant, and many of them were taken at the office of defendant's attorneys, Mr. Garland S. Moore and Mr. Albert Ewing, III. But a number of such policyholders refused to make such affidavit. One of them, introduced by plaintiff as a witness in this case, was Roberta Hoard, who described herself as an "ignorant Negro woman," but whose testimony we must take to be true in considering the propriety of the directed verdict. She said that after trying to get defendant to pay the cash surrender value on a lapsed policy, she and her husband went to see plaintiff about it. Later she was notified to come with her husband to defendant's office. When she

went, one of defendant's agents took her in a car to the office of Mr. Moore. She described what occurred there in these words: ". . . He (Mr. Moore) says, 'Roberta,' he says, 'I am surprised at you. You could have got your money without going to Lackey for it.' I says, 'Well, I went to you all three times, and you all wouldn't give it to me.' He says, 'He will beat you out of it, nothing but thieves, they will cheat you out of it—nothing but thieves, they will drive them out of town, cheating a poor negro woman.' He says, 'Raise your right hand and swear, raise your right hand.' He says, just tell in your own words about that policy. I says, 'I carried it to him.' He says to his stenographer, 'Mr. Lackey came to Roberta's house and solicited her policy.' That is your policy. And he says, after a while, 'Roberta, come around and sign your name.' I says, 'I can't do it.' " (Bill of Ex., Vol. VI, pp. 671, 672.)

On learning that defendant's agents and attorneys had compromised and settled these cases, plaintiff filed petitions in them asking the courts to enforce the statutory lien for his attorney's fees. Defendant, its agents, and attorneys appeared and resisted these petitions in all the cases. In all of them substantially the same defenses were set up. Mr Moore filed affidavits swearing that he was reliably informed and believed plaintiff had not been employed and had no authority to bring the suits. To support these affidavits he produced the affidavits which defendant's agents and attorneys, Mr. Garland S. Moore and Mr. Albert Ewing, IIII, had procured from the policyholder-plaintiffs; and made motions to require plaintiff to show his authority to bring the suits. In addition to such motions, pleas were filed that plaintiff was not authorized by the policyholders to bring the

suits, that he had secured employment in all the cases by illegal and unethical solicitation, and that he had performed no services to entitle him to a fee because defendant was willing and glad to pay the cash surrender values to all the policyholders and the suits were wholly unnecessary.

The courts found all these issues against defendant except in the case of Ethan J. Harris', which we reversed and remanded, opinion filed August 17, 1940, unreported no certiorari being sought. On the remand defendant paid the fee without further litigation in that case. In all the other 150 or 200 cases the courts found against the defenses that defendant was glad to pay and the suits were unnecessary, that plaintiff had not been employed and had no authority to bring the suits, and that he had secured employment by illegal and unethical solicitation; and the courts sustained plaintiff's right to the statutory lien for his fees. Defendant appealed some of these cases to this Court and we affirmed the judgments below. Metropolitan Life Ins. Co. v. Ethel Hamilton, opinion filed February 17, 1941, unreported; Metropolitan Life Ins. Co. v. James Ellison, opinion filed February 22, 1941, unreported, no certiorari being sought in either case.

It appears from the evidence in this record that during the years 1939 through 1942 plaintiff represented many hundreds of policyholders in suits against defendant for the cash surrender values; that despite defendant's claim that it was willing and glad to pay such values to its policyholders, it always denied liability and vigorously litigated every suit in an effort to avoid payment to its policyholders. It appealed many of such suits to this Court, in which we affirmed the judgments below. See

Metropolitan Life Ins. Co. v. Nellie Johnson, opinion filed September 21, 1940, unreported; Metropolitan Life Ins. Co. v. Brown, 25 Tenn. App. 514, 160 S. W. (2d) 434; Metropolitan Life Ins. Co. v. Sara Wells, opinion filed November 14, 1942, unreported; Metropolitan Life Ins. Co. v. Mary Cloud, opinion filed November 14, 1942, unreported.

█ It seems the whole basis for the fierce fight (Mr. Moore said: "I was fighting Joe Lackey as hard as I could." Bill of Ex. Vol. 15, p. 1925) waged by defendant against plaintiff in this case was its claim that it was glad to pay its policyholders free of charge and was only trying to protect them against paying fees to a lawyer. It urges this claim before us; and, referring to the testimony of its agent Bland, it says its local offices voluntarily paid large numbers of policyholders who were not represented by plaintiff and with whom he had no connection. But under the rule above referred to, the testimony of this witness must be discarded, since he was contradicted in many material matters by more than 50 witnesses for plaintiff.

█ As we have seen, evidence for plaintiff was that defendant refused to pay the cash values to large numbers of its policyholders who asked for such payments before seeking the aid of a lawyer; and after the numerous suits were brought for such values defendant denied liability in all of them and persisted in its refusal to pay until it was finally forced to pay by the judgments of the courts. Upon this evidence the jury could well have found that there was no truth in this claim of defendant, and that it waged its fight against plaintiff not to protect its policyholders but to protect itself from paying its policyholders.

As stated, in the latter part of 1938 Mr. Moore went to plaintiff, charged him with unethical practices, and threatened to have him disbarred if he did not stop bringing these suits against defendant. Later Mr. Moore employed a detective, Joe Towler, formerly a member of the Federal Bureau of Investigation, to investigate plaintiff to get evidence for use in the disbarment proceeding as well as in the numerous suits. Mr. Moore gave much publicity to his accusations of unethical practice against plaintiff. He talked to numerous lawyers about it and also to newspaper reporters.

Sometime in April 1939 Mr. Moore and defendant's agents, Lasky and Bland, went before a meeting of the Board of Directors of the Nashville Bar Association. Judge Swiggart, then president of the Bar Association, testified that Mr. Moore told the directors he had a matter he wished to present to them, and that matter was the charges that plaintiff and his brother, the latter operating the Insurance Adjustment Bureau, were working together and interfering with the insurance company in the handling of claims against it. Then Mr. Moore read some of the affidavits they had taken in the manner above stated.

Mr. Albert Ewing, III, was secretary for the Bar Association, and the company employed him as one of its attorneys to assist Mr. Moore in these numerous suits. Mr. Houston Roberts, one of the directors of the Bar Association, testified that someone raised the question of the expenses of prosecuting the disbarment proceeding against plaintiff, and that Mr. Albert Ewing, III, stated that he was authorized to say that defendant would pay the expenses of such proceeding. Mr. Ewing denied this, but we must take it to be true in considering

whether a verdict should have been directed for defendant.

There was appointed a committee, the Committee on Unlawful Practices, to investigate the charges against plaintiff and his brother. This committee held hearings, and Mr. Moore, with Lasky and Bland, presented evidence upon the charges. Plaintiff stated to the committee that he did not consider that his conduct was in anywise unethical but that he was a young man and if it was thought that he was doing anything improper he would abide by any reasonable suggestion or request of the committee or the Directors of the Bar Association. No request or suggestion was made.

This committee made a report July 27, 1939, in which the opinion was expressed that plaintiff's brother, in operating the Insurance Adjustment Bureau, was engaged in the unlawful practice of law; that the case was distinguishable from State ex rel. v. Lytton et al., 172 Tenn. 91, 110 S. W. (2d) 313; and that plaintiff was obtaining business as a result of the advertising by the Insurance Adjustment Bureau, and was doing indirectly what he could not do directly. The committee recommended that the matter be referred to the Grievance Committee to take whatever steps might be deemed proper.

Mr. Moore continued to make charges of unethical conduct against plaintiff, charging him with bringing useless and unnecessary suits for the policyholders, with concealing from them the fact that they could walk right down to defendant's office and get the cash values without suit, with bringing numerous suits in cases where he had not been employed and had not been authorized to bring suit, and with illegal and unethical solicitation of

business. Mr. Moore made these charges both in and out of court—in court in the pending suits and out of court to numerous lawyers and particularly to Directors of the Bar Association.

Another committee was appointed, called the Presentation Committee, of which Mr. Henry E. Colton was the chairman. This committee investigated the charges against plaintiff and recommended that they be dropped because all these matters were before the courts and were being there tried.

This recommendation, however, was not followed. The Presentation Committee was directed to present the charges before the Grievance Committee. Plaintiff was advised by letter that the charges would be heard September 12, 1940, copy of the letter being sent to Mr. Moore. Again, Mr. Moore and defendant's agents, Bland and Lasky, together with Mr. Ewing, were present at the hearing with their affidavits and their witnesses, most of whom were poor and ignorant people whom plaintiff had represented. Mr. Moore, Mr. Ewing, Bland and Lasky sat throughout the hearing and with their files and suggestions assisted in the prosecution of the charges.

Charges involving the honor and integrity of a lawyer and his right to practice are of such grave and serious nature that a grievance committee investigation of them is usually conducted in private. But Mr. Moore and defendant's agent had given such widespread publicity to the charges against plaintiff that it occurred to no one that the investigation should not be public; and the hearings lasting some six days were largely attended.

The Grievance Committee made its report November 4, 1940. It found plaintiff guilty of but one of the

charges: bringing unnecessary suits, and making improper use of the attorney's lien statutes for the collection of attorney's fees, to which he was not entitled, without disclosing to ignorant and illiterate people that defendant was willing to pay them and they could have gone to its office and got their money without suit. But it appears from this record that the Committee did not have before it the evidence later developed upon this issue—the evidence upon which the courts found this issue in favor of plaintiff at least 150 times, and the evidence in this record upon which we think the jury could have made a like finding.

A committee was appointed to file a bill in the Chancery Court, Part I, of Davidson County, on behalf of the Nashville Bar and Library Association, seeking to have plaintiff disbarred from the practice of law; and such a bill was filed against him in September 1941. Defendant's agents and its attorneys, Mr. Moore and Mr. Ewing, furnished the members of this committee the witnesses that were introduced in the prosecution of the charges. When the complainant Bar Association closed its proof, Mr. Lackey began to introduce his proof, calling character witnesses, among others, Mr. Raymond Denney, then president of the Bar Association. Mr. Denney testified that Mr. Lackey was a person of good character and was an ethical lawyer. Thereupon the Bar Association was premitted to dismiss its bill without prejudice.

This appears to have been the end of the disbarment prosecution. This prosecution and the slanders above stated were carried on for some three years. Plaintiff suffered from the defamation heaped upon him by this prosecution and these slanders during this whole

period. His testimony as to his mental suffering was excluded. It is clear, however, that for such defamation damages for mental suffering are recoverable and that such evidence was admissible. Little Stores v. Isenberg, 26 Tenn. App. 357, 363, 172 S. W. (2d) 13; Southeastern Greyhound Lines v. Freels, 176 Tenn. 502, 507, 144 S. W. (2d) 743; 33 Am. Jur. pp. 194, 195; Annotation, 90 A. L. R. 1175.

The effects of such continued defamation were widespread, and extended to the public generally. But despite such effects plaintiff called more than 50 Nashville lawyers, including some of the judges, who vouched for his good character.

There seems to be no denial that defendant's local agents and its attorneys, Mr. Moore and Mr. Ewing, acted under the instructions of defendant. Its general counsel, as we have seen, stated that its local agents and its attorney, Mr. Moore, had taken their position upon instructions of the company. The company seems to have reimbursed Mr. Moore for the payment he made for the services of the detective. It paid a handwriting expert to testify before the Grievance Committee; and it paid the court reporter more than $500 for reporting and transcribing the Grievance Committee hearings. These local agents said that they were acting on the company's instructions, and Mr. Moore stated that he kept the company fully advised, giving such advice often by long-distance telephone conversation.

The former opinions of our Supreme Court established as the law of this case that the declaration as amended stated a good cause of action. A reading of the vast mass of the evidence before us convinces us that there was ample evidence on which the jury could well

have found that the averments of the declaration were all substantially true and that plaintiff was entitled to recover of defendant.

■ We think the jury could have found that defendant, for reasons satisfactory to itself, had set up these cash surrender values, with no intention of paying the policyholders such values except where it was required to do so by the judgments of the courts; that to stop plaintiff from bringing suits for its policyholders for such cash surrender values, defendant and its representatives formed the conspiracy as charged; and that its agents and representatives, acting upon its instructions, uttered the slanders sued for and instigated the disbarment proceeding maliciously and without probable cause, all for the purpose of carrying the conspiracy into effect. In such circumstances the defendant would be liable either upon the theory of conspiracy or upon the doctrine of respondeat superior. Schultz v. Frankfort Marine Acc. & Plate Glass Ins. Co., 151 Wis. 537, 139 N. W. 386, 43 L. R. A., N. S., 520, 525.

For these reasons, the judgment of the circuit court is reversed and the case is remanded for a new trial.

■ Plaintiff makes a number of other assignments of error upon the trial judge's rulings in admitting evidence and in excluding other evidence. But these matters were not included in plaintiff's motion for a new trial; and, therefore, we connot consider them. This, however, does not imply approval of such rulings. Our remand is for a new trial, pursuant to the former opinions of the Supreme Court in this case, and not inconsistent with this opinion. The costs of the appeal in error are adjudged against the defendant Metropolitan Life Insurance Company.

Howell and Hickerson, JJ., concur.