**Donald M. DAILY and Harold W. Daily, Jr., Individually and as Independent Co–Executors of the Estates of Mr. and Mrs. Harold W. "Pappy" Daily; and Glad Music Company, Plaintiffs–Appellees,**

v.

**GUSTO RECORDS, INC.; G.M.L., Inc.; Nashville Quality Duplication Inc., also known as NQD, Inc.; International Marketing Group, Inc., also known as IMG, Inc., (00–5067/5619); and Highland Music, Inc. (00–5066); Defendants–Appellants,**

Gayron "Moe" Lytle and Stephen Hawkins, Defendants.

No. 00–5066, 00–5067, 00–5619.

United States Court of Appeals, Sixth Circuit.

July 17, 2001.

Before GUY, NORRIS, and GILMAN, Circuit Judges.

PER CURIAM.

Defendants appeal from the judgment entered against them after a jury trial on claims of breach of contract, unjust enrichment, and conspiracy to defraud arising out of the plaintiffs' claims for producer's royalties on George Jones master recordings produced by Harold "Pappy" Daily. The jury found in favor of plaintiffs, Glad Music Company, the estates of Mr. and Mrs. Pappy Daily, and the two sons of Pappy Daily, and awarded damages (1) for breach of contract against Gusto Records, Inc., G.M.L., Inc. (GML), and Highland Music, Inc., in the amounts of $260,000, $108,000, and $24,000, respectively; (2) for unjust enrichment against Nashville Quality Duplication, Inc. (NQD) and International Marketing Group, Inc. (IMG) in the amount of $90,000 each; and (3) for conspiracy to defraud by all the defendants, jointly and severally, in the amount of $165,000. Then, after further testimony, the jury awarded punitive damages against the defendants as follows: Gusto Records, $250,000; GML, $250,000; NQD, $31,250; IMG, $208,500; and Highland, $44,500. Finally, the district court accepted the punitive damage awards, granted plaintiffs' request for pre and post-judgment interest, and denied defendants' motions for judgment as a matter of law or new trial.[1]

Gusto and GML both argue that the verdicts against them for breach of contract were unsupportable by the record because there was no proof of any sales by them after 1986. In addition, NQD and IMG contend that they could not have been unjustly enriched because the jury found a valid contractual obligation existed between plaintiffs and the other defendants. Defendants also argue that there is no claim for conspiracy either because the obligations sound in contract, or because the evidence was insufficient to establish such a claim. Finally, defendants challenge the availability of punitive damages, the sufficiency of the evidence to support the damage awards, and the award of prejudgment interest. After careful review of the record and the arguments presented on appeal, we affirm except as to the unjust enrichment claims and the compensatory damage award on the conspiracy to defraud claim.

I.

Pappy Daily was nominated to the Country Music Hall of Fame for his work producing recordings by George Jones, which he did for many years. Under an agreement between Daily and Musicor Records effective January 1, 1968, Daily was to receive producer's royalties on the George Jones master recordings he produced for Musicor Records. A producer's royalty arises by contract and is meant to compensate the person who produces a master recording for the use of the master. Under the agreement, the producer's royalties would be equal to 25% of the amount of the artist's gross royalties. The artist's royalties, in turn, were calculated as a percentage of the retail sales of recordings made from the masters (e.g., 8% of 90% of domestic retail sales). Daily produced recordings by George Jones for

---

1. The district court dismissed other claims before trial and denied plaintiffs' request for rescission. These claims are not at issue on appeal.

Musicor until 1971, when Jones signed with Epic Records.

At that time, Musicor granted RCA exclusive distribution rights to the George Jones master recordings. In a letter dated January 10, 1972, Musicor ratified its agreement to pay Daily producer's royalties on recordings made from the George Jones masters produced under the 1968 agreement and distributed by RCA. A handwritten notation on that document also indicated that royalties would be paid to Daily on "all Musicor product previously released." Relying on this notation, plaintiffs claimed that royalties were due for George Jones master recordings made both before and after 1968. Although the jury specifically found that Daily had produced George Jones master recordings under which plaintiffs claimed producer's royalties, the jury was not asked to identify the recordings or the years those recordings were produced.

Gayron "Moe" Lytle, as the sole owner and president of GML, purchased some master recordings in 1977. While they were not Musicor masters, they included some to which Daily was entitled to publishing royalties. Publishing royalties, as distinguished from producer's royalties, arise by statute and compensate the owner of a musical composition for use of the copyrighted material at a set statutory rate. Lytle was also the sole owner and president of Gusto Records. GML licensed the master recordings to Gusto. Then Gusto, through an intermediary, negotiated an agreement with Daily to pay publishing royalties at half of the statutory rate. In 1982, Daily asked, through the same intermediary, that Lytle look into whether *producer's* royalties were also due on some master recordings Gusto was exploiting. Although assured that Lytle

would look into it, nothing came of that inquiry.

GML did not acquire the George Jones master recordings that were made for Musicor until 1984. Springboard International had purchased Musicor and its master recordings, which it held until declaring bankruptcy in the early 1980s. The Springboard catalogue of recordings, including the George Jones Musicor masters, was acquired by Columbia Special Products, Inc. (CBS) and later sold first to JEY Production Company, then to Koala Records, and finally to GML. GML, which did not manufacture or distribute recordings, licensed the Springboard masters to Gusto and others.

In 1984, when Lytle renegotiated for Gusto to continue to pay Daily publishing royalties at half the statutory rate, Daily made no demand for payment of producer's royalties for the George Jones Musicor masters. There was no demand for producer's royalties at any time before Daily's death in 1987, or before plaintiffs filed suit.[2] Although defendants argued that the failure to demand royalties waived the right to payment, the jury specifically found that plaintiffs had not waived their right to producer's royalties. Defendants do not challenge that finding on appeal.

When Gusto ceased manufacturing and distributing recordings in late 1986, GML granted Highland Music the exclusive right to license, lease, manufacture, or otherwise use the Springboard master recordings. Stephen Hawkins, who had prior business dealings with Lytle, started Highland Music in 1987 in order to do business under the lease with GML. Despite the exclusive grant of rights to Highland, Lytle and Hawkins informally agreed that GML could license the masters to other

2. Plaintiffs filed suit first in a Texas state court. That action was dismissed, however, for lack of personal jurisdiction over the defendants.

companies as well. Also, unlike standard industry contracts under which the owner indemnifies the licensee, the indemnity provisions under the agreement ran from Highland to GML.

The evidence established that the obligation to pay royalties, including producer's royalties, was transferred with the ownership of the master recordings. Although a licensee of an owner may agree to pay the royalties, a license agreement does not shield the owner from the obligation to pay royalties. A royalty is incurred when an entity manufactures and sells recordings made from the masters, or causes them to be manufactured and sold. Gusto, GML, and Highland concede on appeal that they assumed the obligation to pay producer's royalties to the extent that they were due.[3] The district court determined, on defendants' motion for summary judgment, that the statute of limitations barred any claims relating to royalty obligations that came due prior to December 9, 1988.

Plaintiffs maintained that Lytle and Hawkins set up and conducted their businesses in a manner that deliberately made it difficult or impossible for artists and producers to establish what royalties were due them. Lytle was the sole owner and president of GML, Gusto, NQD, and IMG. As such, Lytle controlled (1) GML and Gusto, which each owned the master recordings during the limitations period; (2) NQD, which manufactured cassette tapes from the masters; and (3) IMG, which distributed both cassettes and CDs made from the masters. Plaintiffs argued that Lytle simply divided the functions of a recording company between his entities and inserted Highland between them as a "straw man" to avoid paying royalties. In addition, defendants failed to keep records that identified sales and income by reference to artist or recording, making it impossible to prove a claim for artist's or producer's royalties. There was evidence that the industry practice is to document both the manufacture and distribution of recordings, as well as any third party licensing of the masters, and to rely on the owners to keep complete and accurate records to determine the amount of royalties owed.

Lytle operated GML, Gusto, NQD, and IMG from the same address and each did business with Highland. Highland paid NQD to manufacture cassettes from the masters. NQD transferred the tapes across the warehouse to IMG, which paid Highland one or two dollars per tape. IMG distributed the recordings for three to five dollars each. IMG also sold the recordings at higher prices through its mail order catalogue, which it operated under the unregistered assumed name of Cindy Lou Records. Highland paid 5% of the wholesale price it received from IMG back to GML, but paid other licensors on a "per-track" basis rather than as a percentage of sales. Although Highland had other customers, about 75% of its sales were to IMG.[4]

3. The district court found the defendants were not barred from litigating the issue of whether the obligation to pay royalties followed the master recordings, even though they had stipulated to the issue in another case involving master recordings of other artists that were part of the Springboard catalogue. *See Thomas v. Gusto Records, Inc.*, 939 F.2d 395 (6th Cir.1991). Plaintiffs were not permitted to offer evidence concerning the decision in *Thomas* and, as a result, the district court refused to take judicial notice of the decision in reviewing the punitive damage award.

4. There is no dispute that the activities of NQD, as a manufacturer of tapes, and IMG, as a distributor of CDs, cassettes and other products, did not give rise to a contractual obligation to pay royalties. This is consistent with the jury's finding that only GML, Gusto, and Highland were liable for breach of contract.

Highland admitted to having exploited George Jones master recordings, but contested the amount of producer's royalties that were due as a result. Hawkins prepared a schedule of estimated royalties based upon his review of Highland's records. Plaintiffs argued that the estimates failed to account for the entire period, under-reported sales, overstated credits, and incorrectly calculated the royalties from wholesale rather than retail prices. There were also unexplained credits and accounting transfers between the companies, including a credit memo from Highland to IMG for $363,000. For the period from 1990 to 1998, Hawkins estimated that plaintiffs were owed only $14,020.87 in producer's royalties on master recordings made between 1968 and 1972, or as much as $64,247.72 if Musicor masters recorded before 1968 were also included.

Lytle testified that he believed he had made a profit from the exploitation of the George Jones Musicor masters, but kept no records from which he could make that determination. Lytle admitted that IMG distributed cassettes and CDs made from the Musicor masters owned by GML and Gusto. Lytle did not have IMG keep records, as was customary in the industry, that would identify recordings by number, catalogue, quantity, or cost. Plaintiffs were unable to offer proof from defendants' records that either GML or Gusto sold recordings made from the Musicor masters within the limitations period. Plaintiffs nonetheless maintained that GML and Gusto, as owners, had caused the manufacture and sale of such record-ings and were obligated to pay producer's royalties for such sales.

Plaintiffs also claimed that defendants transferred ownership of the masters to make it more difficult for artists and producers to prove a claim for royalties. In 1994, after plaintiffs had filed suit, GML transferred the Springboard catalogue to Gusto without any written agreement to document the transfer. Lytle testified that GML made the transfer through an accounting entry to pay a debt owed to Gusto. Highland continued to manufacture and sell recordings made from the Springboard masters after that date.

Then, in December 1997, Gusto sold the Springboard master recordings to Catalogue Music, Ltd., an English company. The purchase price of $3.5 million was paid with a promissory note and a deposit of $150,000. Hawkins, as owner and president of Catalogue Music, was the purchaser. When deposed later that same month, however, Lytle testified that the master recordings were still owned by Gusto and that there was no agreement with Hawkins to change ownership of the masters. Plaintiffs did not learn of the transfer until June 1999, about a month before trial. After trial, the district court found that defendants' failure to disclose the sale to plaintiffs was sanctionable.[5]

Plaintiffs filed this action in December 1994 and amended their complaint twice. After defendants' motions to dismiss and for summary judgment narrowed the claims, trial commenced in July 1999. As set forth above, the jury found that Gusto, GML, and Highland had breached their

---

**5.** At the time of the transfer in December 1997, Lytle's companies were being sued in another federal action for royalties on other master recordings that were part of the Springboard catalogue. A motion for temporary restraining order seeking to prohibit the anticipated transfer of the master recordings was filed. The district court found there was a strong probability that the impending transfer to Catalogue Music was fraudulent. After oral argument but before entry of the temporary restraining order, Gusto transferred the masters to Catalogue Music. The sales agreement was later amended to make its effective date January 1, 1998. The same counsel represented the Gusto defendants in this case.

contractual obligation to pay the royalties; that NQD and IMG were unjustly enriched; and that all of the defendants participated in the conspiracy to defraud plaintiffs. A total of $737,000 in compensatory damages and $784,250 in punitive damages were awarded against the various defendants. The punitive damage awards were reviewed and accepted by the district court, as is required by Tennessee law, and judgment was entered accordingly. On March 31, 2000, the district court denied defendants' post-trial motions and awarded plaintiffs both pre and post-judgment interest on the compensatory damage awards. Defendants appealed.

## II.

### A. Motion for Judgment as a Matter of Law

The district court's decision to deny the defendants' motions for judgment as a matter of law is reviewed *de novo*. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). In a diversity action, the district court must apply the state law standard in reviewing a Rule 50(b) motion that challenges the sufficiency of the evidence. *Id.* at 176. At the same time, "we need show no deference to the *trial court's* assessment of the sufficiency of the evidence before a jury, even if state law so requires." *Id.* The court's legal determinations are reviewed *de novo*. *See Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 425 (6th Cir.1998).

Under Tennessee law, a motion for judgment notwithstanding the verdict challenging the sufficiency of the evidence requires a determination of whether there is any material evidence to support the verdict. *See Holmes v. Wilson*, 551 S.W.2d 682 (Tenn.1977). Courts must "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evi-

dence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence." *Id.* at 685. A directed verdict is only appropriate when the evidence is susceptible to but one conclusion. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn.1994).

### 1. Breach of Contract

■ The jury found breach of contract by GML, Gusto, and Highland and awarded damages against them in the amount of $260,000, $108,000 and $24,000, respectively. Defendants do not challenge the jury's finding that Daily produced George Jones master recordings for which plaintiffs claimed producer's royalties. Rather, GML and Gusto argue that there was no evidence that either of them sold recordings made from the masters within the limitations period. While plaintiffs admit to having no proof that GML or Gusto sold or licensed the right to sell recordings, apart from those accounted for by Highland, plaintiffs did not concede that Highland's estimates represented the entire universe of sales for which producer's royalties were due. GML and Gusto argue that reversal is required because the jury was permitted to speculate about both the fact and the amount of such sales.

The district court rejected defendants' challenge to the sufficiency of the evidence, explaining that:

> The evidence adduced at trial showed that the record-keeping and accounting practices of the Gusto Defendants, under the control and ownership of Gayron "Moe" Lytle, were obtuse, non-specific, and highly unusual. In fact, they were so byzantine as to make it impossible for anyone, including Lytle, to determine what royalties were due to the artists and producers whose masters he was exploiting. There was no paperwork documenting the transfers of various

masters between entities controlled by Lytle and none documenting the flow of the revenue stream created through the exploitation of the masters. There was a strong suggestion that Defendants' record-keeping methods were intentionally utilized to mask the true volume of sales from particular products, to thwart discovery of this information, and to avoid liability. In short, evidence of Gusto's and GML's long-term and continuous failure to keep any sort of decipherable record of any liabilities owed to artists and producers was substantial, and not in accord with the general practice within the industry. From all the evidence, a reasonable jury could infer that Gusto and GML sold cassettes, CDs, and/or records made from Plaintiffs' masters after December 9, 1988, such that the companies incurred an obligation to pay producer's royalties.

"Uncertain and speculative damages are prohibited only when the *existence* of damage, is uncertain, not when the *amount* is uncertain." *Cummins v. Brodie,* 667 S.W.2d 759, 765 (Tenn.Ct.App.1983) (emphasis added). All that is required is proof of damages within a reasonable degree of certainty. *See W. Sizzlin, Inc. v. Harris,* 741 S.W.2d 334, 336 (Tenn.Ct.App. 1987). The law does not require exactness in the computation of damages. *See Sholodge Franchise Sys., Inc. v. McKibbon Bros.,* 919 S.W.2d 36, 42 (Tenn.Ct.App. 1995). In fact, "courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties." *Cummins,* 667 S.W.2d at 765.

Our *de novo* review leads us to conclude that there was material evidence from which a jury could reasonably conclude, even without proof of specific sales by GML or Gusto, that those entities caused the manufacture and sale of recordings for which there was an obligation to pay producer's royalties. Although only a few of IMG's catalogs were offered into evidence, they showed that the masters had been exploited and recordings offered for sale. Highland's admitted sales of cassettes and CDs made from the masters, along with the jury's prerogative to conclude that the estimates were not complete and accurate, provided sufficient evidence of the *existence* of damages beyond those admitted by Highland.

There was also evidence that plaintiffs' inability to demonstrate the amount of royalties earned resulted from Lytle's own obfuscatory record-keeping practices. Even Lytle testified that he did not keep records from which he could determine whether he made a profit on recordings made from any particular master and did not keep records from which artist's or producer's royalties could be calculated. Taking the strongest legitimate view of the evidence and all reasonable inferences in favor of plaintiffs, there was sufficient evidence to support the verdicts against GML and Gusto for breach of contract.

### 2. Unjust Enrichment

NQD and IMG argue that they are entitled to judgment as a matter of law on plaintiffs' claims for unjust enrichment because the jury found a valid contract for producer's royalties and awarded damages for breach of that contract. The district court disagreed, explaining that although NQD and IMG did not assume any contractual obligation to pay royalties, they nonetheless profited financially from exploitation of the master recordings produced by Daily. Whether recovery under the quasi-contractual theory of unjust enrichment is barred in this case is a legal determination, which we review *de novo.*

The Tennessee Supreme Court has explained that unjust enrichment, quasi contract, *quantum meruit*, and contracts implied at law all describe "that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto." *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154 (Tenn.1966). The essential elements are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) circumstances under which the acceptance of the benefit without payment would be inequitable. *See id.* at 155. "The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." *Id.*

As a general rule, a contract cannot be implied at law when a valid contract exists on the same subject matter. *See Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn.Ct.App. 1991); *Fletcher Realty, Inc. v. Hayslope Props.*, 712 S.W.2d 478, 481 (Tenn.Ct.App. 1986). In *Paschall's*, the court held that when one furnishes labor and materials under an express contract and the contract becomes invalid or unenforceable, he may seek recovery against the third party who benefitted under a quasi contract theory. Even so, the court also observed that "where one is afforded recovery from the person with whom he has a contract, he cannot also recover from third persons incidentally benefitted by his performance." *Paschall's*, 407 S.W.2d at 154.

Plaintiffs argue that the jury was free to impose an implied contract for producer's royalties against NQD and IMG because they were making profits as part of Lytle's *de facto* record company without incurring the expense of paying the producer's royalties. Yet, plaintiffs have conceded that neither NQD nor IMG had an obligation to pay producer's royalties. While there was evidence that NQD and IMG made profits by operating as separate entities from GML or Gusto, it was not inequitable or unjust for them to make a profit. Rather, plaintiffs were entitled, under either express or implied contract, to receive only producer's royalties equal to a percentage of the retail sales.

Since the jury found a valid contract for producer's royalties and held GML, Gusto, and Highland liable for the royalties incurred through the exploitation of the master recordings, including presumably those recordings manufactured by NQD and sold by IMG, plaintiffs could not also recover royalties from NQD and IMG under a theory of implied contract. Accordingly, we find NQD and IMG were entitled to judgment as a matter of law, and we reverse the verdicts against them for unjust enrichment.

### 3. Conspiracy to Defraud

Civil conspiracy has been defined as "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344, 353 (Tenn.1948). The Court in *Dale* specifically recognized a cause of action for conspiracy to defraud, explaining that:

A "conspiracy to defraud" on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose. The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

*Id.* at 353–54 (citations omitted). Defendants argue that they are entitled to judg-

ment as a matter of law on the conspiracy claim and reversal of both the compensatory and punitive damage awards because (1) the conspiracy claim is not actionable; (2) the evidence was not sufficient to support a finding of conspiracy to defraud; and (3) there was insufficient evidence of either a compensable injury or the kind of conduct required to support a punitive damage award.

### a. Conspiracy to Defraud or to Breach a Contract

Defendants argue that plaintiffs' conspiracy to defraud claim was nothing more than a claim for conspiracy to breach a contract. Although Tennessee has not specifically rejected a cause of action for conspiracy to breach a contract, it does not recognize a cause of action for negligent or tortious breach of contract apart from a breach of contract claim. *See Mid–South Milling Co. v. Loret Farms, Inc.,* 521 S.W.2d 586, 588 (Tenn.1975). The district court denied defendants' motion for judgment as a matter of law on the grounds that the plaintiffs pleaded and proved a claim for conspiracy to defraud, which is recognized in Tennessee, and not a conspiracy to breach a contract or induce a breach of contract. We review this legal determination *de novo,* while adhering to the jury's factual findings.[6]

Defendants rely principally upon two New York cases that held allegations of fraud in connection with the failure to pay royalties were insufficient to state a claim distinct from a claim for breach of contract. In *Miller v. Columbia Records,* 70

A.D.2d 517, 415 N.Y.S.2d 869, 871 (N.Y.App.Div.1979), the court affirmed the dismissal of an action to recover royalties and in doing so concluded, without any discussion, that the complaint "trie[d] but fail[ed] to allege a cause of action for an independent fraud as distinct from breach of contract."

In *Rodgers v. Roulette Records, Inc.,* 677 F.Supp. 731, 738 (S.D.N.Y.1988), the district court granted summary judgment to the defendants after finding that not only were the fraud claims time barred, but also that the plaintiff had failed to state a claim. The plaintiff alleged that the false royalty statements constituted fraudulent misrepresentation and breach of contract. However, falsely representing that one is abiding by a contract is not sufficient to state a claim for fraud separate from the breach of contract under New York law. Thus, the court found that the "fraud claim fails for the simple reason that the fraud they allege is nothing more than the breach of contract." *Id.*

Reliance on these cases alone, however, begs the critical question of whether plaintiffs' conspiracy claim alleged nothing more than conspiracy to breach a contract. Another New York decision confirms that one does not have a cause of action against another contracting party for conspiracy to breach the agreement between them. *See North Shore Bottling Co. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968). "But it is equally plain that a contracting party may be charged with a separate tort liability aris-

---

6. Highland contends that we may disregard the plaintiffs' characterization of a claim as a tort when the injury is the deprivation of a contractual right. *See Alexander v. Third Nat'l Bank,* 915 S.W.2d 797 (Tenn.1996); *Pera v. The Kroger Co.,* 674 S.W.2d 715, 720 (Tenn.1984). In both *Alexander* and *Pera,* however, the Court was confronted with the question of which statute of limitations ap-

plied, not whether a separate tort claim could be alleged. The Court explained that: " 'It is well settled in [Tennessee] that the gravamen of an action, rather than its designation as an action for tort or contract, determines the applicable statute of limitations.' " *Alexander,* 915 S.W.2d at 798 (quoting *Pera,* 674 S.W.2d at 719).

ing from a breach of a duty distinct from, or in addition to, the breach of contract." *Id.* at 193.

■ In this case, plaintiffs maintained that the defendants joined in a common plan to fraudulently conceal the exploitation of the master recordings by maintaining records "in such a way that the information needed to determine royalty obligations was either missing or was so obfuscated that no royalties could ever be accurately calculated." Plaintiffs also alleged that the defendants conspired to defraud by "masking" ownership of the masters to make the pursuit of a claim more difficult. While both the breach of contract and conspiracy to defraud claims arose out of the contractual obligation to pay royalties, the objects of the alleged conspiracy to defraud were distinct from the breach of the contractual obligation to pay producer's royalties. In addition, concealment of a material fact may constitute fraud when, among other things, it appears that one party to the contract reposed a trust and confidence in the other. *See Justice v. Anderson County*, 955 S.W.2d 613, 616–17 (Tenn.Ct.App.1997) (quoting *In Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418 (1885)). We find that plaintiffs' claim for conspiracy to defraud did not simply restate a breach of contract claim.

b. Sufficiency of Evidence

Defendants argue that they are entitled to judgment as a matter of law because there was no evidence to support the finding that they participated in a conspiracy to defraud plaintiffs either through their record-keeping practices, or by "masking" ownership of the master recordings. Taking the evidence and all reasonable inferences in favor of the plaintiffs, we find that there was material evidence, both direct and circumstantial, from which the jury could have concluded that each of the defendants participated in the conspiracy to defraud the plaintiffs.

Defendants maintain that they were ignorant of plaintiffs' claim to producer's royalties, so could not have intended to defraud them through the alleged conspiracy. Highland argues specifically that it did not "hide" its activities from plaintiffs since it negotiated and paid publishing royalties to plaintiffs from which plaintiffs could have determined that it was exploiting some of the master recordings at issue. While this was admittedly true, the jury was nonetheless entitled to disbelieve the claims of ignorance by Lytle and Hawkins.[7] Finally, Highland contends that there was no evidence it participated in the conspiracy by failing to keep adequate records since plaintiffs' expert was not permitted to give his opinion concerning Highland's record-keeping practices. On the contrary, Hawkins himself testified and was cross-examined concerning the records kept by Highland and his own estimate of the royalties due based upon those records.

We find that there was evidence from which the jury could conclude that GML, Gusto, Highland, NQD, and IMG reached a tacit understanding that the records created through their business with each other would not set forth the information

---

**7.** Notably, when Hawkins flatly denied ever participating with Lytle in efforts to avoid other royalty obligations, the district court allowed him to be impeached with the fact that Hawkins and Highland had been found in contempt of court for violating an express term of a prior judgment prohibiting the exploitation of certain master recordings. *See*

*Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1317 (9th Cir.1998). The jury was instructed that this evidence was admitted for the limited purposes of challenging Hawkins' credibility; showing Hawkins' knowledge of Highland's relationship to and dealings with Gusto and GML; and demonstrating motive or opportunity.

necessary to calculate the royalties due to artists and producers. That understanding may be inferred from the interrelationship between the companies; Lytle's failure to keep any records from which royalty payments could be calculated; the departures from industry standards in the dealings between GML, Gusto, and Highland; and the secret transfer of the master recordings to a company owned by Hawkins.

### c. Compensatory and Punitive Damages

The jury found that the defendants were each involved in the conspiracy to defraud plaintiffs and awarded $165,000 in compensatory damages against the defendants, jointly and severally. In denying the defendants' motion for judgment as a matter of law, the district court found that there was evidence that plaintiffs sustained injuries in addition to their contract damages as a result of the conspiracy. The court indicated further that those injuries "include emotional pain and suffering, as well as expenses incurred in attempting to determine what royalties were owed and in attempting to collect them. These expenses alone totaled over $345,000."

■ Defendants challenge the sufficiency of the evidence to support the award, arguing that emotional injuries are not compensable absent expert testimony. This argument seriously misapprehends the decision in *Camper v. Minor*, 915 S.W.2d 437 (Tenn.1996), which held that expert testimony is required to establish a *prima facie* case of *negligent* infliction of emotional distress. *Compare Miller v. Willbanks*, 8 S.W.3d 607 (Tenn.1999). As plaintiffs observe, damages for mental suffering are recoverable in an action for civil conspiracy. *See Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn.Ct.App.1993) (citing *Lackey v. Metro. Life Ins. Co.*, 30 Tenn.App. 390, 206 S.W.2d 806 (1947)).

There must, however, be evidence of mental suffering to support the jury's award.

■ Defendants also argue that evidence of legal fees and expenses incurred in this litigation cannot support the award. First, legal fees and expenses are not recoverable absent a contractual or statutory obligation. *See John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534–35 (Tenn.1998). Second, as defendants correctly observe, the evidence concerning the amount of fees and expenses incurred was only presented during the punitive damages phase and was not before the jury when it awarded compensatory damages on the conspiracy claim.

The record shows that plaintiffs' counsel did not request damages for emotional injury or money expended to prosecute the action in closing argument. Nor was the jury instructed on any particular element of damages resulting from the conspiracy to defraud claim. Even taking the strongest legitimate view of the evidence in favor of the plaintiffs, the evidence was insufficient to support the *amount* of compensatory damages awarded for conspiracy to defraud. The fact of injury, however, is supported by the record. Therefore, plaintiffs are entitled to an award of nominal damages and the district court is directed to enter judgment in favor of plaintiffs in the amount of $1.00 against the defendants, jointly and severally, for conspiracy to defraud.

■ With respect to punitive damages, the jury specifically found by clear and convincing evidence that the defendants acted intentionally, recklessly, maliciously, or fraudulently in conspiring to defraud plaintiffs. The district court's judgment set forth its findings and conclusions with regard to its decision to accept the jury's punitive damage award. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn.1992) (trial judge shall review and

accept or reject award of punitive damages). Our decision on the compensatory damage award does not undermine the punitive damage awards, which are supported by more than sufficient evidence. *See Oakley v. Simmons,* 799 S.W.2d 669 (Tenn.Ct.App.1990).

On appeal, Highland argues that there was insufficient evidence to support an award of punitive damages. The district court rejected this contention, finding that

> when viewed in toto, the record shows clear and convincing evidence that this conduct was intentional, reckless, malicious, and/or fraudulent such that punitive damages are justified. The intentional nature of this conduct can easily be inferred from the following facts. Defendants knew they were in sole control of the information regarding the transfers of titles and ownership of the masters and of the sales records and licensing agreements. They knew they were not making any producer's royalty payments on the masters at issue, and they tried to avoid payment by masking the trail of title ownership and responsibility for payment. When questioned about their liability for payment, Defendants initially denied they owed Plaintiffs any royalties and assumed the defensive position of demanding Plaintiffs produce the documents and records to prove their claim. Defendants were aware that their records and record-keeping methods prevented any clear resolution of this problem. At trial, one

of the Defendants candidly admitted that producer's royalties were owed to Plaintiffs on some of the masters, but it could not determine how much and on which masters.

We agree with the district court that the evidence was sufficient to support the finding, by clear and convincing evidence, that the defendants each acted intentionally, recklessly, maliciously, or fraudulently in conspiring to defraud the plaintiffs. Defendants do not otherwise challenge the district court's acceptance of the punitive damages awards, or its findings on the specific factors considered by the jury in determining the proper amount to be awarded.[8]

B. Prejudgment interest

■ Finally, defendants contend that the district court abused its discretion by awarding prejudgment interest on the compensatory damage awards for breach of contract, unjust enrichment, and conspiracy because the amount of defendants' obligations were neither certain nor reasonably ascertainable. We disagree.

There is no dispute that in a diversity action the question of prejudgment interest must be determined under state law. *See Mass. Benefit Ass'n v. Miles,* 137 U.S. 689, 11 S.Ct. 234, 34 L.Ed. 834 (1891). Under Tennessee law, the award of prejudgment interest, as an element of, or in the nature of damages, is permitted in accordance with the principles of equity at

---

8. The factors considered included: (1) defendants' financial affairs, condition, and net worth; (2) the nature and reprehensibility of the wrongdoing, which was defined as the impact on the relationship between plaintiffs and defendants; (3) defendants' awareness of the amount of harm caused and its motivation in causing it; (4) the duration of the misconduct and whether defendants tried to conceal it; (5) the expense plaintiffs bore in attempting to recover their losses; (6) whether defendants profited from the activity and, if so, whether the punitive damages should exceed defendants' profits in order to deter similar behavior; (7) whether and the extent to which defendants have been subject to previous punitive damage awards for the same wrongful act; (8) whether defendants took remedial action or attempted to make amends by offering prompt and fair settlement for actual harm once the wrong was known to them; and (9) any other circumstances that bear on determining the proper amount of punitive damages.

a rate not to exceed 10% per annum. *See* TENN. CODE ANN. § 47–14–123 (1995). An award of prejudgment interest will not be disturbed unless the record reveals a manifest and palpable abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 446 (Tenn.1992).

The principles guiding the exercise of discretion to award prejudgment interest were clarified by the Tennessee Supreme Court in *Myint v. Allstate Insurance Co.,* 970 S.W.2d 920 (Tenn.1998). Identifying the principles of equity as being "foremost," the Court explained:

> Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.

*Id.* at 927. The Court observed that two additional criteria have emerged from the case law; one of which being that prejudgment interest is allowed when the amount of the obligation is certain (or can be ascertained) and is not disputed on reasonable grounds. *See Mitchell v. Mitchell,* 876 S.W.2d 830, 832 (Tenn.1994). The Court noted, however, that only a liquidated claim can truly be considered an obligation of certain and indisputable amount. Consequently, the Court clarified that

> if the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as a matter of equity.... The converse, however, is not necessarily true. The uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discre-

tion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

*Myint,* 970 S.W.2d at 928.

In this case, the district court focused upon the proper considerations in finding that the ends of justice and equity were best served by awarding prejudgment interest on the compensatory damages. The district court also concluded that the defendants' obfuscatory record-keeping practices were the cause of the uncertainty concerning the amount of damages and, as a result, plaintiffs should not be penalized for the fact that the damages could not be proven with certainty. We find no abuse of discretion in this regard.

For the reasons set forth in this opinion, the district court's denial of judgment as a matter of law to the defendants on the breach of contract claims, the conspiracy claim, and the award of punitive damages is AFFIRMED. The denial of judgment as a matter of law is REVERSED on the unjust enrichment claims against NQD and IMG and with respect to the compensatory damages awarded for conspiracy to defraud. The award of prejudgment interest is AFFIRMED with respect to the breach of contract claims and VACATED with respect to the unjust enrichment claims. The matter is REMANDED for entry of judgment consistent with this opinion, including the award of $1.00 in nominal damages for conspiracy to defraud against the defendants, jointly and severally, along with the appropriate amount of prejudgment interest on that award.