Christopher H. JASPER, Plaintiff-Third-Party-Defendant-Counter-Defendant-Appellant,

Marvin Isley, Plaintiff–Appellant,

v.

BOVINA MUSIC, INC., Intervenor-Defendant-Counter-Claimant-Appellee,

T–Neck Records, Inc., Intervenor-Plaintiff-Third-Party-Plaintiff-Appellee.

Docket Nos. 01–7628(L), 01–7668(CON).

United States Court of Appeals, Second Circuit.

Argued: Sept. 9, 2002.

Decided: Dec. 20, 2002.

Robert W. Ottinger, Jersey City, N.J. (Joseph A. Turco, Jersey City, N.J., on the brief), for Plaintiff–Appellant Isley.

Margaret C. Jasper, South Salem, N.Y., for Plaintiff–Third–Party–Defendant–Counter–Defendant–Appellant Jasper.

Leon Friedman, New York, N.Y. (Craig A. Smith, Suelthaus & Walsh, St. Louis, MO., on the brief), for Intervenor–Defendant–Counter–Claimant–Appellee Bovina Music, Inc., and Intervenor–Plaintiff–Third–Party–Plaintiff–Appellee T–Neck Records, Inc.

Before WALKER, Chief Judge, NEWMAN, and F.I. PARKER, Circuit Judges.

**44**

JON O. NEWMAN, Circuit Judge.

This appeal primarily presents issues as to whether federal court jurisdiction is available for a case involving a dispute as to ownership of song copyrights, and, if jurisdiction is available, whether copyright interests were validly assigned. These issues arise on an appeal by Plaintiffs–Appellants Christopher H. Jasper and Marvin Isley from the May 1, 2001, judgment of the District Court for the Southern District of New York (Barrington D. Parker, Jr., then-District Judge) dismissing, after a bench trial, their claims against Appellees Bovina Music, Inc. ("Bovina") and T–Neck Records, Inc. ("T–Neck"). We conclude that, although the case largely concerns issues of contract interpretation that are insufficient for federal court jurisdiction, it also sufficiently requires interpreta-

tion of section 204(a) of the Copyright Act, 17 U.S.C. § 204(a) (2000) to support such jurisdiction. We also conclude that the written document requirement of section 204(a) was satisfied and that the Plaintiffs' claims were properly rejected. We therefore affirm.

## Background

The Plaintiffs' lawsuit concerns claims for two broad categories of music royalties: (a) royalties from the sale of records, CDs, and other recordings of songs, and (b) royalties from various other uses of songs, such as public performances on radio or television, use of the songs in a movie, and sale of sheet music. Instead of the category labels used by the parties and the District Court,[1] we will call the first

---

1. The parties and the District Court called the first category "Performance Royalties" and the second category "Publishing Royalties." The Court's opinion defined "Performance Royalties" as "monies directly generated by record sales and other sound recordings" and "Publishing Royalties" as "monies generated by the exploitation of the musical compositions themselves—that is, the words and the music of the songs." The Court explained that "[i]n the music industry, Publishing Royalties are typically created through the efforts of a musical publishing company or administrator who licenses use of the work to third parties. Such licenses include: (a) mechanical licenses that allow other record companies to use the work ('cover' songs), (b) public performance fees when a song is played on the radio or in a concert, (c) sampling rights that permit other artists to use pieces of the song, and (d) synchronization rights when a musical work is used in a movie, commercial or television show." We do not think clarity is promoted by using the phrase "Performance Royalties" to mean income from record sales and at the same time using the phrase "Publishing Royalties" to include "public performance fees."

   We note that although the terms "performance royalties" and "publishing royalties" have been used in a few reported appellate opinions, these terms are not terms of art with precise meanings. Indeed, they have not

been given consistent meanings. We have said that "performance royalties" are "paid by the performer to performing rights societies such as [ASCAP], of which the songwriter and publisher are members.... ASCAP's practice is to distribute half of the performance royalties to the songwriter ('writer distributions'), and the remaining half to the publisher ('publisher distributions').... [T]he songwriter and publisher may by contract alter the allocation of performance royalties." *Larry Spier, Inc. v. Bourne Co.,* 953 F.2d 774, 776 (2d Cir.1992). *See Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 109 (2d Cir.1993) ("performance royalties" used to mean payments distributed by performing rights society). By "performer" we refer not only to the person who sings the song but also to "radio stations, television stations, restaurants, stores and other entities that 'perform' music publicly." *Woods v. Bourne Co.,* 60 F.3d 978, 984 (2d Cir.1995). The Ninth Circuit has used "performance royalties" to refer to the income due a song composer for licensing the synchronization right that permits a song to be recorded on the soundtrack of a movie. *See Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1450–51 (9th Cir.1996).

   Appellate courts have used the phrase "publishing royalties" in the context of music to have various meanings. *See Ahern v. Scholz,* 85 F.3d 774, 779, 795 (1st Cir.1996)

category "record royalties" and the second category "song royalties." The songs were written and recorded by the well known singing group "the Isley Brothers" ("the Group"). Three older brothers, Rudolph, O'Kelley (now deceased), and Ronald Isley (the "Older Isleys") were the original members of Group. The Older Isleys wrote and recorded a number of popular hit records, including "Shout" (1959) and "Twist and Shout" (1962). In 1969, the Older Isleys formed T–Neck as their recording company, and, in 1973, T–Neck and the Older Isleys contracted with CBS to distribute the Group's records and collect record royalties and pay them to T–Neck (the "CBS agreement"). Also in 1973, the Older Isleys formed Bovina as their publishing company to administer the Group's musical catalogue and collect song royalties. The Older Isleys were the sole shareholders, officers, and directors of both T–Neck and Bovina.

In 1973, two other brothers, Ernest and Marvin Isley, and a brother-in-law, Christopher H. Jasper, (the "Younger Isleys") became members of the Group, contributing to the writing of the group's songs between 1973 and 1983. On album covers and in copyright registrations during this period, all six Isley Brothers were listed as co-authors of the songs that the Group recorded and performed.

In January 1980, Bovina and April Music, Inc. ("April") made an agreement (the "Bovina/April Agreement") under which April would co-administer the Group's compositions and collect the song royalties.

In the Bovina/April agreement, Bovina assigned to April an undivided 50 percent interest in the Group's songs, explicitly including "the copyrights therein," and April agreed to pay Bovina royalties at various rates for various uses of the songs. For example, April agreed to pay Bovina 50 percent of the net income from April's 50 percent share of public performance income collected from performing rights societies, i.e., 25 percent; 50 percent of April's income derived from April's license of the songs for use in records, for sound synchronization in movies or television, or for use in printed versions; and $.20 for each sale of a printed piano or vocal copy of the songs. The last page of the Bovina/April agreement is an addendum, signed by all six members of the Group, including Marvin Isley and Christopher Jasper, whereby each "assent[ed] to the execution of [the] agreement and agree[d] to be bound by the terms and conditions thereof."

In April 1980, the Younger Isleys signed the CBS agreement and agreed to be bound by its terms, thereby joining the Older Isleys in designating CBS to distribute the Group's records and collect record royalties to be paid to T–Neck.

In 1984, the Older Isleys filed individual Chapter 11 bankruptcy proceedings, which were subsequently converted to Chapter 7 liquidations and consolidated. Marvin Isley ("Marvin") and Christopher Jasper ("Christopher" or "Jasper"), the Appellants in the pending appeal, filed proofs of claims seeking substantial sums for song

(royalties owed by manager of music group to composer of two record albums); *Daily v. Gusto Records, Inc.*, 14 Fed. Appx. 579, 582 (6th Cir.2001) (unpublished opinion) ("Publishing royalties ... arise by statute [17 U.S.C. § 115] and compensate the owner of a musical composition for use of the copyrighted material at a set statutory rate."); *see also Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1234 (11th Cir.2002) (intended meaning unclear).

The Nimmer treatise categorizes the primary sources of revenue for the owner of a copyright in a musical composition as "public performance income, mechanical licenses, synchronization licenses, ... and print publishing revenues." 6 Nimmer on Copyright § 30.02[F], at 30–102 (2002).

royalties they allegedly had not received. This step encountered an unanticipated response. The bankruptcy trustee ("Trustee"), relying on the two claimants' contention that they were partners in all of the Group's musical businesses and therefore each entitled to 1/6th of the partnership's income and assets,[2] contended that the claimants were each liable for 1/6th of the partnership's debts, which exceeded $4 million. That contention resulted in separate settlements between the Trustee and each of the two claimants, memorialized in agreements approved by the Bankruptcy Court in 1991. These agreements included releases by Christopher and Marvin, the construction of which are at issue in this litigation.

In the pending litigation, the District Court ruled that the Appellants had conveyed to April their 1/6th interests in an undivided 50 percent interest in the copyrights for the Group's songs, thereby defeating the Appellants' claim against Bovina for song royalties that April had paid to Bovina under the Bovina/April agreement. The Court also ruled that the releases executed in the bankruptcy proceedings conveyed to T–Neck rights of Christopher and Marvin in the recordings that had been recorded on the T–Neck label, thereby defeating the Appellants' claims against T–Neck for record royalties.

## Discussion

### I. Jurisdiction

■ In the District Court, all parties appear to have assumed that federal jurisdiction existed simply because the case involved a dispute as to ownership of rights in copyrighted songs and records. See 28 U.S.C. § 1338 (2000) (federal courts have exclusive jurisdiction over actions arising under the Copyright Act). However, as Judge Friendly pointed out, the fact that a case concerns a copyright does not necessarily mean that it is within the jurisdiction of a federal district court. See T.B. Harms Co. v. Eliscu, 339 F.2d 823, 825–28 (2d Cir.1964); see also Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 347–56 (2d Cir.2000); Merchant v. Levy, 92 F.3d 51, 55–56 (2d Cir.1996). Specifically, if the case concerns a dispute as to ownership of a copyright, and the issue of ownership turns on the interpretation of a contract, the case presents only a state law issue, and, unless the complaint asserts a remedy expressly granted by the Copyright Act, federal jurisdiction is lacking, in the absence of diversity jurisdiction. T.B. Harms, 339 F.2d at 826 ("[T]he federal grant of ... a copyright has not been thought to infuse with any national interest a dispute as to ownership or contractual enforcement turning on the facts or on ordinary principles of contract law."). On the other hand, if interpretation of the Copyright Act is required (or if a remedy available under the Act, such as damages for infringement, is sought), then federal jurisdiction is available. Id. at 828. As this appeal illustrates, the line between contract interpretation and statutory interpretation is not always clear.

■ The uncertainty arises in this case because of the interplay between section 204(a) of the Copyright Act, which provides that a valid assignment of a copyright requires a writing signed by the alleged assignor, and the Bovina/April Agreement, which the Appellants signed. As the Appellants see the case, the issue is whether the Bovina/April Agreement constitutes a "writing" within the meaning of

---

**2.** In June 1980, the Group members signed an agreement to form a partnership called "Isley Brothers Enterprises," which provided that each of the six members would receive 1/6th of all past and future monies generated by the Group.

section 204(a). As the Appellees see the case, the issue is whether the Bovina/April Agreement should be interpreted to convey a 50 percent interest in the Appellants' copyrights. In some sense, both sides have identified an issue that requires decision. The difficulty is that almost every case involving contract interpretation, appropriate for state court determination, could be recharacterized as a case appropriate for a federal court simply by framing the issue to be whether the disputed contract qualified as a writing within the meaning of section 204(a). However, the line drawn in *T.B. Harms* cannot be obliterated by such verbal gymnastics. The need for interpretation of a contract does not necessarily mean that there is a bona fide issue as to whether the contract is a writing for purposes of section 204(a). In most cases, there will be no doubt that the contract is a section 204(a) writing, and the only substantial issue will be contract interpretation.

This case, however, is the rare contract interpretation case that does present a substantial issue as to whether the contract qualifies as a section 204(a) writing. The reason stems from the fact that the Appellants signed the Bovina/April Agreement after it was executed by Bovina. Prior to signing by the Appellants, it would have been clear that the Bovina/April Agreement was not a section 204(a) writing, as far as the Appellants are concerned, because they (the alleged assignors) had not signed it. Once the Appellants signed the addendum and agreed to the terms of the contract, the issue arose as to whether an addendum agreeing to a contract that purports to transfer a copyright owner's rights is a section 204(a) writing. Although this is not an especially difficult issue, it suffices to render this case within federal court jurisdiction.

## II. The Section 204(a) Issue

On the merits of the section 204(a) issue, we have no doubt that the addendum satisfies the written document requirement of section 204(a). It is signed by the Appellants, and it commits them to the assignment to April of a 50 percent interest in their copyrights. Whether the assignment is conceptualized as an assignment of interests from the Appellants to Bovina and then to April, or directly from the Appellants to April, the purposes of section 204(a) are achieved. The assignment is in writing, the Appellants have signed it, and there is no risk whatever that an unsuspecting copyright owner has been induced to sign a document that does not clearly indicate an assignment of copyright interests. The assignment defeats the Appellants' claims for song royalties.

## III. The Release Issues

Both Appellants dispute that the releases they signed in the bankruptcy proceeding sufficed to relinquish their claims for record royalties.

### A. Jasper's Releases

Jasper's settlement with the Older Isleys' estate was set forth in two releases, one dated June 1991 and the other September 1991 (the "Jasper Releases"). Both Jasper Releases were signed by Jasper and his wife, and the first release was also signed by Jasper's counsel and the Bankruptcy Judge. The District Court found that the Jasper Releases followed "aggressive arms length negotiation" during which Jasper was represented by counsel.

The June 1991 release included the following provisions:

2. . . . Jasper acknowledges and agrees: (1) that T–Neck Records, Inc. shall continue to have all rights in and to recordings made by Jasper that have

heretofore been recorded for release on the T–Neck Records, Inc. label and to receive all royalties relating thereto, without in any[ ]way limiting Jasper's rights to songwriters royalties retained herein. . . .

In the September 1991 release, Jasper agreed to "release and give up any and all claims and rights," known or unknown, against the Older Isleys, Bovina, and T–Neck Records. In return, as the District Court found, Jasper "received $175,000, but avoided responsibility for the millions of dollars in liabilities of the Older Isley's bankruptcy estate, including liabilities for which the Trustee contended Jasper was jointly liable."

In view of the unambiguous language of Jasper's releases, the District Court properly ruled that Jasper's claims against T–Neck for record royalties had been validly released.

### B. Marvin's Release

Marvin's release is contained in the May 17, 1991, consent order entered by the Bankruptcy Judge in the Older Isleys' consolidated Chapter 7 proceedings. That order, signed by Marvin and Ernest Isley, states that he and Ernest "hereby release and discharge the Debtors and all corporations owned or controlled by the Debtors [*i.e.*, including Bovina and T–Neck] . . . from any and all claims that they have or may have against the Debtors and all corporations owned or controlled by the Debtors. . . ." Like Jasper, Marvin was faced with the prospect of being liable for 1/6th of the debts of the Older Isleys' bankruptcy estates. He avoided that possibility by surrendering his claim for past record royalties and releasing any future claim for record royalties. He also received nearly $47,000 for songwriter royalties.

The record fully supports the District Court's conclusion that Marvin released his claim for record royalties.

### Conclusion

We have considered all of the Appellants' remaining claims and conclude, for substantially the reasons stated by the District Court, that they lack merit. The judgment of the District Court is affirmed.